**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESSE JAMES ANDREWS,
  *Petitioner-Appellant*,

v.

RON DAVIS, Warden,
  *Respondent-Appellee*.

No. 09-99012

D.C. No.
2:02-CV-08969-R

JESSE JAMES ANDREWS,
  *Petitioner-Appellee*,

v.

RON DAVIS, Warden,
  *Respondent-Appellant*.

No. 09-99013

D.C. No.
2:02-CV-08969-R

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
January 12, 2015—Pasadena, California

Filed August 1, 2017

Before: Sandra S. Ikuta, N. Randy Smith,
and Mary H. Murguia, Circuit Judges.

Order;
Opinion by Judge Ikuta;
Dissent by Judge Murguia

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel withdrew an opinion filed August 5, 2015; denied as moot a petition for rehearing and petition for rehearing en banc; and filed a superseding opinion in an appeal and cross-appeal arising from Jesse James Andrews's conviction and capital sentence for three murders.

The panel reversed the district court's grant of relief on Andrews's ineffective-assistance claim that he was prejudiced by his counsel's failure to investigate and present additional mitigating evidence at the penalty phase of his trial. The panel held that under 28 U.S.C. § 2254(d)(1), the California Supreme Court did not unreasonably apply Supreme Court precedent in concluding that Andrews was not prejudiced by any deficient performance.

The panel dismissed as unripe the sole claim certified by the district court for appeal – that California's use of its lethal injection protocol to execute Andrews would violate his

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Eighth Amendment rights. The panel held that because no new protocol was in place at the time the district court ruled on the claim, the district court erred in entertaining the claim.

The panel denied Andrews's request to certify for appeal his uncertified claims of unconstitutional delay between sentencing and execution, ineffective assistance of counsel, failure to disclose material exculpatory evidence and false testimony, and destruction of evidence.

The panel held that the district court did not abuse its discretion in denying Andrews's motion for an evidentiary hearing.

Dissenting in part, Judge Murguia would affirm the district court's order granting Andrews relief due to ineffective assistance of counsel at the penalty phase of his trial.

**COUNSEL**

Michael Burt (argued), Law Office of Michael Burt, San Francisco, California, for Petitioner-Appellant/Cross-Appellee.

Xiomara Costello (argued), Sarah J. Farhat, Shira Seigle Markovich, and A. Scott Hayward, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Keith H. Borjon, Supervising Deputy Attorney General; Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General; Edward C. DuMont, Solicitor General; Michael J. Mongan, Deputy Solicitor General; James William Bilderback II, Supervising Deputy Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee/Cross-Appellant.

**ORDER**

The opinion filed August 5, 2015, and reported at 798 F.3d 759, is withdrawn. Because the court's opinion is withdrawn, appellant/cross appellee's petition for rehearing and petition for rehearing en banc is moot. A superseding opinion will be filed concurrently with this order. Further petitions for rehearing and petitions for rehearing en banc may be filed.

## OPINION

IKUTA, Circuit Judge:

Jesse James Andrews appeals from the district court's denial of all but one of the claims raised in his petition for a writ of habeas corpus under 28 U.S.C. § 2254. The state cross-appeals the district court's grant of relief on Andrews's claim that his counsel's assistance was ineffective at the penalty phase of his capital murder trial. We dismiss as unripe the claim the district court certified for appeal, and deny Andrews's motion to expand the certificate of appealability to include uncertified claims. We reverse the district court's grant of relief on the ineffective assistance claim because, under 28 U.S.C. § 2254(d)(1), the California Supreme Court did not unreasonably apply Supreme Court precedent in concluding that Andrews was not prejudiced by any deficient performance by his counsel.

I

A

On December 9, 1979, police were called to a Los Angeles apartment, where they found the bodies of three murder victims. *People v. Andrews*, 776 P.2d 285, 288 (Cal. 1989). The murder victims were Preston Wheeler, who lived in the apartment, Patrice Brandon, and Ronald Chism. *Id*. The California Supreme Court described the murder scene as follows:

> Wheeler had been stabbed in the chest six times and shot in the neck at close range with either a .32– or .357– caliber weapon. His

face and head were bruised, and his face had
been slashed with a knife.  Brandon and
Chism had been strangled with wire coat
hangers.  Their faces were bruised, Chism's
extensively.  Brandon's anus was extremely
dilated, bruised, reddened and torn, consistent
with the insertion of a penis shortly before her
death.  There was also redness around the
opening of her vagina, and vaginal samples
revealed the presence of semen and
spermatozoa.  All three victims were bound
hand and foot.

*Id*.

Approximately a year later, police arrested Charles
Sanders in connection with the murders.  *Id*.  Sanders entered
into a plea agreement, in which he pleaded guilty to three
counts of second degree murder, admitted a gun
enhancement, and agreed to cooperate with the prosecution,
in exchange for a sentence of 17 years to life in prison.  *Id*.
During his interrogation by the police, Sanders gave both a
tape-recorded and a written statement.  *Id*.  He also testified
at Andrews's trial, and described the crime as follows:

Sanders testified that he and [Andrews]
devised a plan to rob Wheeler, a drug dealer.
[Andrews]  armed  himself  with  a
.357 magnum and gave Sanders a .38–or
.32–caliber automatic.  On the evening of the
murders, they visited their friend, Carol
Brooks, who lived in the same apartment
building as Wheeler, and then went to
Wheeler's apartment.  In response to their

knocking, Wheeler, who apparently knew [Andrews], let them in. Also inside the apartment was a woman (Patrice Brandon). After smoking some marijuana with Wheeler, [Andrews] and Sanders drew their guns. Sanders tied Wheeler and Brandon with belts and socks, put on a pair of gloves, and began to search the apartment for drugs and money. Except for some powder on a saucer which appeared to be cocaine, the search was unsuccessful. [Andrews] questioned Wheeler, who denied having any drugs or money. Saying he would make Brandon talk, [Andrews] dragged her into the kitchen and closed the door. Sanders remained in the living room with Wheeler.

Sanders heard [Andrews] hitting Brandon and later heard sounds as though they were having sex. When [Andrews] came out of the kitchen shortly thereafter, Sanders saw Brandon's pants around her ankles.

[Andrews] put his gun in Wheeler's mouth. He threatened to kill Wheeler and Brandon unless Wheeler revealed the location of the drugs. Wheeler said the 'dope' was in the attic, and pointed out a trap door leading up to it. Sanders climbed into the attic. While in the attic, Sanders heard two shots. When he came down, [Andrews] told him he had shot Wheeler because the latter had tried to jump out the window. Sanders asked if Wheeler was dead. [Andrews] responded he was

'standing right up' on Wheeler when he fired the gun . . . . When Sanders asked about Brandon, [Andrews] replied he had killed her before leaving the kitchen.

While [Andrews] and Sanders were cleaning up the apartment, Ronald Chism knocked on the door and asked if everything was all right. [Andrews] said Wheeler was home and invited him inside. [Andrews] then hit Chism on the head, tied him up, and took him into the bathroom. Sanders saw [Andrews] sitting astride Chism's back, joining and separating his clenched fists in a tugging motion, apparently strangling Chism. Sanders then saw [Andrews] go into the kitchen and choke Brandon with a wire clothes hanger. When the two left the apartment, [Andrews] gave Sanders some money, saying it was all he had found.

*In re Andrews*, 52 P.3d 656, 658 (Cal. 2002) (alterations, citations, and internal quotation marks omitted). Andrews was eventually arrested, and he was charged in June 1982.

At trial, the jury heard Sanders's testimony as well as the testimony of Carol Brooks. Brooks confirmed that Andrews and Sanders visited her on the night of the murders and told her about their plan to "get some money" from Wheeler. *People v. Andrews*, 776 P.2d at 289. A week after the incident, Sanders told her about his involvement in the murders. *Id.* Then, a few weeks later, Andrews confessed to her that he shot Wheeler, had sex with Brandon, and took $300 during the robbery. *Id.*

The prosecution also presented fingerprint evidence. *Id*. Police experts analyzed 50 prints lifted from the apartment; three prints belonged to Andrews. *Id*. One fingerprint was found on a coffee table in Wheeler's living room. *Id*. Two palm prints were found on the kitchen floor, on either side of the spot where Brandon's body was found, the left palm print being about a foot from her body.

The defense primarily focused on undermining Sanders's credibility. *Id*. Two jail inmates who had been incarcerated with Sanders testified. *Id*. They stated that, while Sanders was incarcerated with them, he made statements suggesting he planned to lie about the murders to shift blame onto Andrews and away from himself. *Id*.

The jury deliberated for three days before finding Andrews guilty of murder.[1] The jury also found three special circumstances to be true. Two special circumstances related to the offense conduct: (1) multiple murder and robbery murder, based on the murders of Wheeler, Brandon, and Chism, and the robbery of Wheeler, and (2) rape-murder, based on the rape and murder of Brandon. *In re Andrews*, 52 P.3d at 659. The third special circumstance was Andrews's conviction for murder of a grocery store clerk in 1967. *Id.*

At the penalty phase, both the prosecutor and defense counsel made brief presentations. The prosecutor presented evidence through a joint stipulation. *Id*. He noted that the jury had already found that Andrews had been convicted of murder in 1967. The parties also stipulated that Andrews had

---

[1] Andrews was convicted after his second trial, because the jury failed to reach a verdict in the first trial.

been convicted of armed robbery in May 1968, convicted of escape in November 1969, and convicted of robbery in June 1977. *Id*. The stipulation did not describe the facts of the offenses underlying these additional convictions. The prosecution also submitted photographs of the dead bodies of Patrice Brandon and Ronald Chism as they were found by the police in the apartment; the photos had been excluded at the guilt phase on the ground they were unduly inflammatory. *Id*. Finally, the parties stipulated that Andrews's birth date was July 2, 1950. *Id*.

The defense evidence consisted of two sworn statements that were read to the jury. *Id*. The statements described facts underlying the incident in September 1966 that formed the basis of Andrews's 1967 conviction for murder. According to the statements, Andrews and a 17-year-old companion, both of whom were armed, attempted to rob a grocery store, and the companion fired three shots, killing the grocery store clerk. *Id*.

In his closing argument, defense counsel focused on mitigating circumstances. He argued that Andrews's crimes were unsophisticated, occurred several years apart, and all involved the unexpected escalation of a planned robbery. *Id*. He pointed out that Andrews was only 15 years old at the time of the murder of the grocery store clerk, and was not the shooter. *Id*. He portrayed Andrews's conduct as less blameworthy because the murders occurred while Andrews, Sanders, Wheeler, and Brandon were under the influence of illegal drugs. *Id.* at 659–60. Finally, he emphasized that other murderers had received life without the possibility of parole despite the jury's finding of special circumstances, and despite more blameworthy conduct. *Id.* at 659. He pointed out that in this very case, Sanders received a sentence of only

17 years to life.  *Id.* at 660.  The prosecution made no rebuttal.

After one day of deliberations, the jury returned a verdict imposing the death penalty for each of the three murder counts.  The court sentenced Andrews to death on June 8, 1984.  The California Supreme Court affirmed the conviction and sentence on direct appeal on August 3, 1989.  *People v. Andrews*, 776 P.2d at 285, 288.

B

Andrews filed petitions for state post-conviction relief, claiming, among other things, that his counsel's assistance was ineffective at the penalty phase because counsel did not adequately investigate and present mitigating evidence.  The California Supreme Court summarily denied all of Andrews's claims, except for his penalty phase ineffective assistance of counsel claim.

1

The California Supreme Court appointed a referee to take evidence and make factual findings on six questions related to Andrews's penalty phase ineffective assistance of counsel claim.  *In re Andrews*, 52 P.3d at 659.  Under California law, "[b]ecause appellate courts are ill-suited to conduct evidentiary hearings, it is customary for appellate courts to appoint a referee to take evidence and make recommendations as to the resolution of disputed factual issues."  *People v. Romero*, 883 P.2d 388, 393 (Cal. 1994), *as modified on denial of reh'g* (Jan. 5, 1995).  While a referee's findings on factual questions are not binding on the California Supreme Court, they "are entitled to great weight when

supported by substantial evidence." *In re Johnson*, 957 P.2d 299, 307 (Cal. 1998). The six questions provided to the referee were:

> 1. What mitigating character and background evidence could have been, but was not, presented by petitioner's trial attorneys at his penalty trial?

> 2. What investigative steps by trial counsel, if any, would have led to each such item of information?

> 3. What investigative steps, if any, did trial counsel take in an effort to gather mitigating evidence to be presented at the penalty phase?

> 4. What tactical or financial constraints, if any, weighed against the investigation or presentation of mitigating character and background evidence at the penalty phase?

> 5. What evidence, damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal, if petitioner had introduced any such mitigating character and background evidence?

> 6. Did petitioner himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner? If so, what specifically did petitioner request?

*In re Andrews*, 52 P.3d at 659.

The referee received the testimony of more than 50 witnesses over the span of six years. *Id.* at 660. As a threshold matter, the referee pointed out two factors that the California Supreme Court should take into account in evaluating the information obtained in the reference hearing. First, the referee acknowledged that "[t]he length of time available to develop, expand and refine the depth of the evidence presented at this reference hearing obviously creates an artificial setting and this court notes that the abundance and massiveness of the evidence presented could not and would not have been the same in an original trial." *Id.* at 660 n.2. Among other things, "[s]trategic considerations alone would have undoubtedly resulted in a greater refinement of the quality of evidence presented." *Id.* Second, the referee's consideration of counsel's work was hindered by the fact that the lead counsel, Gerard Lenoir, died before the referee conducted the hearing, and only the secondary counsel, Halvor Miller, was available. *Id.* at 663 n.7. Miller could not recall the full scope of Lenoir's investigation. *Id.* at 663.

In her report, the referee provided one-paragraph summaries and detailed factual findings in response to each question. The California Supreme Court both summarized the referee's findings and explained the weight it gave to these findings. *Id.* at 660–65.

In response to the first question (what mitigating character and background evidence could have been, but was not, presented by petitioner's trial attorneys at his penalty trial), the referee identified three broad categories of mitigating evidence that were available but not presented to the jury: Andrews's family background; the conditions of his

confinement in a juvenile reform school and in the Alabama prison system; and his mental health. *Id.* at 660. As summarized in the court's opinion, the referee's report found the following regarding Andrews's background. When he was very young, Andrews's alcoholic parents separated, and his mother left him to be raised by his grandparents and aunt in a large family home with his siblings and cousins, located in a poor, segregated neighborhood of Mobile, Alabama. *Id.* The referee described Andrews's grandfather as "loving, benevolent, and responsible," *id.*, and the court added that Andrews's mother regularly sent money and clothing to her children and that Andrews's upbringing and early family life were "relatively stable and without serious privation or abuse," *id.* at 670. When Andrews was around nine or ten, his mother returned home with children by another marriage, of whom Andrews was jealous. *Id.* at 660, 670. Around that time Andrews's grandfather, a "pivotal figure" in his life, died. *Id.* at 660 (internal quotation marks omitted). Andrews became withdrawn, skipped school, and at age 14, committed car theft and was sent to a reform school known as Mt. Meigs, formally the Alabama Industrial School for Negro Children. *Id.*

Summarizing the referee's report, the California Supreme Court stated that "[a]t Mt. Meigs, petitioner encountered appalling conditions." *Id.* According to the referee's report, one witness described it as "a farming operation and a penal colony for children," while others described "inhuman conditions, inadequate food and clothing and severe beatings" with "sticks, broom handles, tree limbs, and hoe handles . . . or fan belts." Among other things, the referee found that Andrews "was subjected to beatings, brutality, inadequate conditions and sexual predators." *Id.* at 661. Further, "[h]is passiveness and small physique caused him to be a target of

older, tougher boys, from whom no protection or separation was provided." *Id.*

After his release from Mt. Meigs, Andrews began to associate with Freddie Square, an older boy with "manipulative and criminal tendencies." *Id.* In September 1966, three months after Andrews's release, Andrews and Square entered a grocery store, drew guns, and announced that they were conducting a robbery. *Id.* When "the store clerk placed his hand down the front of his apron," Square shot the clerk, killing him. *Id.* Andrews "acted as a lookout in the robbery, but played a more active role when he and Square robbed a taxi driver during their getaway," and used the taxi as a getaway car. *Id.* At the reference hearing, Harry Woodall, the driver of the stolen taxi, testified that Andrews and Square robbed him at gunpoint. *Id.* at 665. While pointing a gun at Woodall, Andrews twice said, "Let's shoot him." *Id.* Andrews and Square stole Woodall's wallet, then ordered him out of the taxi and fired three shots at him; Andrews fired at least two of the shots. *Id.* In 1967, Andrews was convicted of murder based on the grocery store incident, and in 1968, he was convicted of armed robbery of the taxi driver. *Id.* at 661 n.4. Just before he turned 18, he was committed to Alabama state prison. *Id.* at 661. He escaped from prison and was convicted of that offense in 1969. *Id.* at 659. He remained in prison until 1976.

Summarizing the referee's findings about conditions in the four different prisons in which Andrews was confined over ten years, the California Supreme Court stated:

> [The referee] described conditions in these institutions as abysmal, characterized by severe overcrowding, racial segregation,

> substandard facilities, no separation of the
> tougher inmates from younger or smaller
> inmates, constant violence, the persistent
> threat of sexual assaults and the constant
> presence of sexual pressure, the availability
> and necessity of weapons by all inmates, and
> degrading conditions in disciplinary modules.
> [Andrews] not only received beatings but was
> also personally subjected to sexual assaults.

*Id*. at 661 (internal quotation marks omitted). The referee
stated that Andrews "was rarely the instigator of violence,"
was "the prey rather than the predator" when he was
involved, and was often a target of violence due to his small
stature. *Id*. at 662 (internal quotation marks omitted). He
also "appeared to adjust well when the structure permitted"
and, "when circumstances permitted, he tended to hold
positions of responsibility." *Id*. At the same time, however,
Andrews "was personally involved in violence, including the
stabbings of two inmates who had been threatening him." *Id*.
at 661 (internal quotation marks and alterations omitted).

   Shortly after his release from prison in 1976, Andrews
engaged in an attempted robbery of a laundry. *Id.* According
to testimony at the reference hearing:

> Mobile Police Officer Pettis testified that on
> March 23, 1977, he responded to a robbery
> call. Entering the store from which the call
> came, he and other officers saw [Andrews]
> holding a crying young woman hostage with
> a cocked gun at her head. He told the officers
> to leave and "continued to repeat, 'Someone's
> going to get shot, I'm going to shoot.'" The

> officers withdrew. Ultimately, [Andrews] surrendered to the officers after releasing the young woman and another woman whom he had also held hostage.

*Id*. at 665. Andrews was arrested for the robbery and held in Mobile County Jail. *Id.* at 661. After a failed attempt to escape from the jail, he succeeded in escaping on his second try, and fled to California. *Id.* at 661 & n.5.

In California, Andrews met Debra Pickett, with whom he had a stable relationship. *Id.* at 661. The couple had a child, and Andrews held a job during this time. *Id.* But by December 1979, Andrews had resumed using cocaine and left his job and family. *Id.* Soon after, he committed the three murders at issue here. *Id.*

The referee also described the testimony from mental health experts that could have been presented at the penalty phase. Summarizing the referee's report, the California Supreme Court noted that defense experts diagnosed Andrews with a range of mental disorders, including attention deficit disorder, post traumatic stress disorder (PTSD), and mild to moderate organic brain impairment, in part due to drug use and possibly due to a head injury in prison. *Id.* The defense experts opined that Andrews's learning disability, the adverse circumstances of his childhood, the impact of the correctional systems, and the PTSD made his commission of the murders and sexual assault more understandable and less morally culpable. *Id.* at 661–62. The experts gave specific examples of how Andrews's impairments and the brutal conditions of incarceration made it difficult for him to avoid getting into trouble with the law. *Id.* at 661–62, 670. For example, one defense psychiatrist testified that Wheeler, one

of the three victims in the December 1979 murders, had called Andrews a "faggot" a few days before the murders occurred, and Andrews's PTSD would predispose him to overreact to the slur. *Id.* at 680. The psychiatrist concluded that Andrews was "affected by serious emotional disturbance when he committed the murders." *Id.*

The California Supreme Court then recounted the referee's findings on questions two, three, and four. These questions addressed the investigative steps trial counsel took to gather mitigating evidence for the penalty phase, steps the trial counsel *could* have taken to do so, and the constraints that weighed against the trial counsel investigating or presenting mitigating character and background evidence at the penalty phase. *Id.* at 662–64. According to the referee, trial counsel hired defense investigators for the guilt phase, while the counsel themselves did the investigative work for the penalty phase. *Id.* at 663. The trial counsel took two trips to Mobile, one in 1983 and another in 1984. On the first trip, they spent a day searching court records for Andrews's prior convictions and documents relating to his background. *Id.* They also searched for relatives and potential witnesses in Andrews's neighborhood. *Id.* On the second trip, counsel obtained information about Andrews's prior murder conviction at the county courthouse. *Id.* Counsel also traveled to Pensacola, Florida, where they interviewed Andrews's mother. *Id.* During the course of the interview, they obtained information that Andrews was a slow learner, that his grandparents raised him, and that he started getting into trouble as a teenager. *Id.* Miller remembered telling Andrews's mother that if he obtained Andrews's permission to obtain information from family members or other contacts, he or Lenoir would contact her for further information. *Id.*

The California Supreme Court also summarized the referee's findings about the constraints placed on trial counsel in conducting their penalty phase investigation, though the death of Lenoir limited this aspect of the referee's investigation. *Id.* at 663–64. According to the referee, there were tactical, rather than financial, constraints. *Id.* Miller recalled the main tactical constraint as "the adamancy of petitioner's opposition to having his family, and in particular his mother, testify at the trial." *Id.* at 664. According to the referee, "Mr. Miller was very consistent in his testimony regarding petitioner's refusal to cooperate in this area, and this position is supported circumstantially by statements made by petitioner as well as testimony from the prosecutor." *Id.* Miller stated that Andrews had threatened to disrupt the proceedings if his directions were not followed, and both counsel believed this threat was genuine. *Id.* "Acceding to these wishes," neither Miller nor Lenoir "pursued a full investigation of petitioner's background or family and never learned the names of family members with one or two exceptions." *Id.*

In addition to the constraints imposed by Andrews, the referee found that counsel were concerned about the effects of using prisoners as witnesses. *Id.* Miller doubted that jurors would be impressed by the credibility and demeanor of the prisoners, and he was concerned that calling prisoners as witnesses would risk disclosure of Andrews's misconduct in prison. *Id.* The referee found that Andrews had been involved in two stabbings of other inmates and had escaped from custodial facilities on two occasions. *Id.* Further, the referee found that the inmates who provided testimony at the reference hearing had "substantial violent criminal records and these offenses included a substantial number of escapes." *Id.* Finally, Miller testified that he and Lenoir decided not to

present evidence about Andrews's upbringing, because the house and neighborhood in which Andrews grew up resembled the house and neighborhood in which Miller was raised, and so counsel thought a "poverty-presentation" lacked viability. *Id.*

The California Supreme Court also summarized the referee's views on additional investigative steps that counsel could have taken. *Id.* at 662–63. The referee found that obtaining information regarding the circumstances of Andrews's upbringing, the impact of the correctional facilities in Alabama and Andrews's adult experiences, and the psychiatric aspects of Andrews's history did not call for "any extraordinary efforts beyond simple persistence." *Id.* at 662. The referee believed that Andrews's mother could have provided more information about Andrews's upbringing and directed counsel to other family members and acquaintances who could have provided general information regarding schooling issues. *Id.* Counsel could have obtained addresses and information about additional witnesses through publicly available documents or through word of mouth. *Id.* The referee also believed that "[s]everal areas of inquiry were available relating to petitioner's experiences in the correctional system in Alabama." *Id.* Counsel could have obtained prison records from the juvenile and adult correctional systems and could have contacted inmates referenced in those records. *Id.* Or counsel could have conducted "standard legal research of public records relating to lawsuits involving these institutions." *Id.* While acknowledging that "petitioner's cooperativeness was a significant issue," the referee found that counsel could have developed the information presented at the reference hearing "through outside sources in the absence of any cooperation from the petitioner." *Id.* at 663.

In addition, although there was "no significant written history" in the area of mental health, and there was little evidence of "family members having mental impairments," the referee found that counsel could have appointed psychiatric experts. *Id.* at 662. The referee acknowledged that "[a]ny such inquiry may not necessarily have resulted in the availability of evidence of the diagnoses of organic brain impairment, learning disorders, or of post traumatic stress disorder." *Id.* According to the referee, "[t]he quality of standardized personality tests was not the same, the knowledge of post traumatic stress disorder was in an infancy stage, and the resulting diagnosis may not necessarily have been favorable to the petitioner." *Id.* at 662–63.

In addressing question five (what evidence, damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal, if petitioner had introduced any such mitigating character and background evidence), the referee found that the prosecution's rebuttal presentation could have included evidence about two of Andrews's prior convictions. *Id.* at 664. First, the prosecutor could have presented testimony from the taxi driver in the 1968 robbery, who would have testified he heard Andrews say "[l]et's shoot him," and then fired at least two shots at him. *Id.* at 665. Second, the prosecution could have informed the jury about Andrews's attempt to rob a laundry business following his release from prison in 1976, which involved holding two women hostage, one with a gun to her head. *Id*. at 661, 665. The jury had heard that Andrews was convicted of these offenses, but it did not hear the facts on which the conviction was based; the prosecutor could have introduced a complete description of the underlying events as aggravating evidence, to show

Andrews's greater moral culpability for the rape and triple-murder. *Id.* at 659, 664.

Further, the referee determined that the prosecution could have called its own mental health experts to rebut Andrews's evidence. *Id*. at 665. The state could have presented expert testimony that Andrews did not suffer from PTSD, but rather suffered from antisocial personality disorder, resented authority, and had a normal-range IQ of 93. *Id*. A second state expert would have testified that Andrews's ability to hold a job and maintain a stable relationship with Debra Pickett before he committed the murders strongly indicated that he had not suffered brain damage. *Id*. In addition, the expert would have testified that Andrews's "behavior on the night of the murders showed planning and thought, and it was therefore unlikely that petitioner was under the influence of PCP when he committed the murders." *Id.*

Finally, in response to question six (did petitioner himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner, and, if so, what specifically did petitioner request), the referee concluded that there was no doubt that Andrews "adamantly" refused to allow counsel to approach his mother and family or to have them testify. *Id.* This conclusion was based on the trial records and the consistent testimony of witnesses at the reference hearing. *Id.* In response to specific questioning from the trial court "regarding his reluctance to have his mother called," and in the face of the trial court's advice that his mother's testimony would be valuable, Andrews "was very precise in his response, telling the judge that he fully understood and that this was his choice and no one else's." *Id.* (emphasis omitted). The referee further noted that the lead counsel, Lenoir, "represented on the

record at trial that petitioner refused to have his mother called and that he 'had his reasons,' which Mr. Lenoir did not wish to disclose to the court." *Id.* The referee also found that "petitioner went so far as to threaten to disrupt the trial if his mother were called." *Id.* Andrews's opposition to having counsel involve his family was corroborated by his older sister and uncontradicted by his mother.[2] *Id.*

2

After considering "the record of the hearing, the referee's factual findings, and petitioner's original trial," the California Supreme Court concluded that "petitioner received constitutionally adequate representation, and any inadequacy did not result in prejudice." *Id.* at 659.

In reaching this conclusion, the court began by stating the requirements for an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984). First, the court stated that "[t]o prove a claim of ineffective assistance of counsel at the penalty phase trial, the petitioner must establish that counsel's performance [(1)] did not meet an objective standard of reasonableness under prevailing professional norms and [(2)] that he suffered prejudice thereby." *In re Andrews*, 52 P.3d at 667 (internal quotation marks omitted).

---

[2] At the reference hearing, Andrews disputed the finding that he did not want his family involved, but the California Supreme Court noted that "the referee credited Miller's testimony that [Andrews] objected not only to his mother's involvement, but also to that of any relatives," and gave the referee's credibility determination the "great weight" to which it is entitled under California law. *Id.* at 667.

Turning first to the deficiency prong, the California Supreme Court concluded that Andrews had not established that his counsel's performance was defective. Its reasoning was as follows. Under *Strickland*, "the Supreme Court specifically addressed counsel's duty to investigate and made clear courts should not equate effective assistance with exhaustive investigation of potential mitigating evidence." *Id.* at 668. Any judicial scrutiny "must be highly deferential," and courts must avoid second guessing counsel's assistance and must "eliminate the distorting effects of hindsight." *Id.* at 667 (quoting *Strickland*, 466 U.S. at 689). Further, while "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," the Supreme Court made clear that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 668 (quoting *Strickland*, 466 U.S. at 690–91). Moreover, "valid strategic choices are possible even without extensive investigative efforts." *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). Finally, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," and may be "based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* (quoting *Strickland*, 466 U.S. at 691).

Applying this deferential standard in light of the evidence developed by the referee, the California Supreme Court concluded that "counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment." *Id.* at 669 (quoting *Burger*, 483 U.S. at 794–95).

First, the California Supreme Court found that counsel could have reasonably decided not to pursue information from Andrews's family in light of Andrews's decision to curtail such an investigation. The court noted that while "the referee found that counsel could have discovered the mitigating evidence presented at the reference hearing with 'simple persistence,'" the evidence showed that Andrews limited the investigation counsel could undertake by insisting that counsel not involve his family. *Id.* at 668. Counsel were within the range of professional competence in complying with Andrews's wishes, because under California law, "an attorney representing a defendant at the penalty phase of a capital case is not required to present potentially mitigating evidence over the defendant's objections." *Id.* (quoting *People v. Kirkpatrick*, 874 P.2d 248, 262 (Cal. 1994)).[3]

Further, to the extent counsel interviewed Andrews's mother and attempted to contact family members despite Andrews's objection, the court found that counsel could have reasonably concluded that the information they obtained was not powerfully mitigating. *Id.* at 670. Andrews's mother "did not abandon him, but left him with an extended family including his 'loving and responsible' grandfather, regularly

---

[3] Despite the constraints imposed by Andrews, the California Supreme Court found that Andrews's counsel traveled to Mobile, Alabama twice to search for relatives, potential witnesses, and legal documents, and also traveled to Pensacola, Florida to interview Andrews's mother. *In re Andrews*, 52 P.3d at 663. The dissent concedes as much, Dissent at 97–98 n.1, so its finding that Andrews's counsel conducted "virtually no penalty phase investigation" is merely an expression of the dissent's negative evaluation of counsel's efforts. Dissent at 97. But because the California Supreme Court determined that counsel was reasonable in not pursuing further information, the only question raised under the Antiterrorism and Effective Death Penalty Act (AEDPA) is whether this was an objectively unreasonable application of *Strickland. See Richter*, 562 U.S. at 101.

sent money and clothing to her children, and returned several years later to remain in the family home." *Id.* The testimony from family members generally showed Andrews's early upbringing and family life "to be relatively stable and without serious privation or abuse. All but one of his siblings completed high school, and only one had a minor brush with the law." *Id.* Counsel's preliminary investigation showed that Andrews's childhood was not mitigating: "Miller viewed petitioner's childhood surroundings as unimpressive because he found them comparable to his own." *Id.* at 673. Andrews "did not suffer a home environment that would place his crimes in any understandable context or explain his resorting to crime every time he was released or escaped from prison." *Id.* at 670. Moreover, his stable conditions in California could have led the jury to conclude that Andrews's "abandonment of his own son to pursue a cocaine habit and his former criminal ways would belie the suggestion he merited sympathy due to his parents' drinking and abandonment and his grandfather's death." *Id.* at 671. "Under these circumstances, counsel could reasonably reject a background mitigation strategy in favor of an alternate basis to plead for petitioner's life." *Id.* at 673.

Second, the California Supreme Court found that counsel could have reasonably decided not to develop evidence regarding the conditions of Andrews's confinement. *Id.* at 670–71.[4] Relying in part on the referee's findings, the

---

[4] Relying on the opinion of the dissenting Justice in the California Supreme Court's opinion in this case, *In re Andrews*, 52 P.3d at 681 (Kennard, J., dissenting), the dissent claims that Andrews's attorneys rendered ineffective assistance because they allegedly failed to ask Andrews any questions regarding his prison conditions. Dissent at 100–101. But under AEDPA, we do not perform such a de novo review of a petitioner's *Strickland* claim; rather, we ask only whether the state

California Supreme Court noted that while the conditions in which Andrews had been incarcerated "leaves no doubt petitioner endured horrifically demeaning and degrading circumstances," counsel could reasonably conclude that introducing evidence about these conditions from former inmates could have "proved a double-edged sword," because the jury could have had negative impressions of the witnesses and the evidence that would color their views of Andrews. *Id.* The witnesses testifying to the conditions under which Andrews was incarcerated included "one death row inmate, with serious felony records for murder, rape, and armed robbery," as well as many inmates who "had themselves engaged in brutality while in prison and escaped with some frequency." *Id.* at 671. The jury could have drawn an "unfavorable comparison" with Andrews in both cases, and "[r]ather than engendering sympathy, the evidence could well have reinforced an impression of him as a person who had become desensitized and inured to violence and disrespect for the law." *Id.* Moreover, the witnesses' "criminal histories would automatically subject them to impeachment." *Id.* The court also found that hearing such witnesses testify about brutal conditions in Alabama would "raise the question of why petitioner so readily resorted to crime when he escaped the brutal and predatory conditions in Alabama and relocated to California, where he found work and started a family." *Id.* Counsel could also reasonably conclude that having inmates describe the Alabama prison conditions would "potentially open the door to additional evidence of petitioner's criminal

---

court's application of *Strickland* was objectively unreasonable. *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

past." *Id.* at 673.**[5]**   Among other things, "evidence of prison conditions could have led to the jury's learning of petitioner's second escape from custody," which could have "created a danger defense counsel reasonably sought to avoid." *Id.* at 669.**[6]**

---

**[5]** The dissent erroneously argues that no reasonable counsel could have decided to avoid the dangers of relying on prisoner testimony because "the Mt. Meigs evidence was not dependent upon testimony from prisoners" but rather could have been offered by the "experts and respected observers" who testified at Andrews's state court evidentiary hearing. Dissent at 99–100, 102–103.   In reaching this conclusion, the dissent substitutes its de novo finding for the findings of the California Supreme Court, which held that "whatever mitigating evidence may have been disclosed by pursuing the conditions of incarceration petitioner experienced, counsel knew such evidence would come primarily from the testimony of petitioner's fellow prisoners, many of whom were hardened criminals with serious felony records." *In re Andrews*, 52 P.3d at 668–69. Under 28 U.S.C. § 2254(d)(2), a federal court "may not second-guess" a state court's factual findings unless the state court was "not merely wrong, but actually unreasonable" in light of the record before it.   *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).   The dissent could not reasonably conclude that the California Supreme Court's conclusion was objectively unreasonable given that it is not clear that the "experts and respected observers" who testified at the state court evidentiary hearing, which occurred almost a decade after Andrews's sentencing hearing, would have been available to testify at Andrews's sentencing hearing in 1984.

**[6]** The dissent argues that the California Supreme Court was unreasonable in excusing counsel's failure to discover Mt. Meigs evidence based on Andrews's refusal to involve his family. Dissent at 99–100. This strained reading of the California Supreme Court's broad statement about mitigating evidence is itself unreasonable.   In fact, the California Supreme Court never stated that there was a connection between family restrictions and prison conditions.   Rather, the court concluded that Andrews's restrictions on his family's involvement would have limited counsel's ability to develop *Andrews's background and childhood*. *In re Andrews*, 52 P.3d at 662 (noting that, if permitted, "[t]rial counsel could have

Third, the California Supreme Court found that counsel could have reasonably decided not to introduce expert testimony on Andrews's mental health because "[t]he prosecutor could have exploited the testimony of the mental health experts to petitioner's disadvantage." *Id.* at 670. The court noted that one of the experts at the reference hearing testified "that convicts tend to react with rage to perceived insults, behavior they find difficult to shed even when discharged," and while this may have explained Andrews's actions, "it does not necessarily create a sympathetic impression" because "[t]he jury could just as readily infer petitioner was unable to control lethal impulses on the slightest provocation." *Id.* Moreover, there would have been a battle of the experts regarding whether Andrews had suffered any brain damage at all. *Id.* And "[a]s the reference hearing demonstrated, a mental health penalty defense would also have given the prosecution several opportunities to repeat the circumstances of the crime as well as petitioner's past criminality in questioning the experts on both direct and cross-examination as to whether petitioner exhibited an antisocial personality rather than some form of mental impairment." *Id.*

Finally, the California Supreme Court concluded that counsel had been reasonable in adopting the strategic

---

contacted petitioner's family to develop his background and childhood"). On the other hand, the California Supreme Court concluded that "[e]vidence relating to the impact of the juvenile and adult correctional systems could have been developed *by obtaining prison records and contacting inmates* referenced in those records as well as conducting standard legal research of public records relating to lawsuits involving these institutions," *id.* (emphasis added), and the main constraint on using this evidence was "the inherent problems of calling prisoners as witnesses," *id.* at 664.

approach of minimizing Andrews's "culpability by circumscribing his background and mitigating his criminal responsibility." *Id.* at 669. In implementing this strategy, counsel portrayed Andrews as "a follower rather than violently antisocial" and "urged the jury to consider in mitigation the fact that others who had committed more heinous multiple murders had been sentenced to life without possibility of parole and that [Andrews's co-defendant] received a comparatively lighter sentence." *Id.*[7] According to the California Supreme Court, this approach "not only presented a reasonable case for sparing petitioner's life under the circumstances, but foreclosed the introduction of substantial aggravating evidence in rebuttal or on cross-examination that could have undermined the defense by depicting petitioner as aggressive and desensitized to violence." *Id.* (citation omitted).[8]

---

[7] The dissent criticizes the California Supreme Court for concluding that Andrews's counsel adopted a reasonable strategy by, among other things, portraying Andrews as a follower who was less culpable than others. Relying again on the dissenting California Supreme Court Justice, the dissent claims that "the only evidence before the jury was that petitioner was the instigator rather than a follower." Dissent at 104 (quoting *In re Andrews*, 52 P.3d at 682 (Kennard, J., dissenting)). Once again, the dissent's de novo fact finding is contrary to the California Supreme Court's reasonable conclusion based on evidence that the jury had before it a stipulation regarding Andrews's role in the 1966 grocery store robbery which portrayed Andrews as a follower. *In re Andrews*, 52 P.3d at 659.

[8] Andrews and the dissent argue that the prosecutor would not have put on additional rebuttal evidence. Dissent at 107, 115. But the California Supreme Court rejected this argument, finding that the presentation of mitigating evidence would have prompted the prosecutor to shift the focus of his penalty phase case, put on additional witnesses, and use cross-examination and closing argument to further damage Andrews's mitigation case. *In re Andrews*, 52 P.3d at 665–66. Contrary to the dissent, Dissent at 108 n.5, federal courts must defer to the state court's

Given these valid reasons for not pursuing Andrews's background, and the fact that "a lengthy presentation of a broad range of witnesses describing in detail various aspects of petitioner's background" would "have been atypical for a penalty phase defense" at the time of the trial, *id.*, the court concluded that "counsel's strategic decision to limit the scope of their investigation of mitigating background evidence and not to present such evidence at the penalty phase came within 'the wide range of reasonable professional assistance,'" *id.* at 671 (quoting *Strickland*, 466 U.S. at 689).

3

The California Supreme Court next confirmed that this conclusion was consistent with then clearly established

---

factual findings, *see, e.g.*, 28 U.S.C. § 2254(e) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."). The California Supreme Court noted that it was "clear from the record that much damaging testimony regarding petitioner's own violent conduct in prison and other circumstances desensitizing inmates to violence could have, and undoubtedly would have, been elicited on cross-examination." *Id.* at 666. Among other evidence, the testimony of the taxi driver in the 1968 robbery would have rebutted witnesses who characterized petitioner as a follower by "demonstrat[ing] petitioner could and did take the initiative for violence" and the police officer's testimony in the 1977 laundry robbery would have shown "petitioner's lack of reluctance to use violence to obtain his ends." *Id.* The court therefore concluded that "substantial evidence supports the referee's finding that presenting the mitigating evidence would have opened the door to damaging rebuttal." *Id.* In repeating Andrews's claim that the prosecutor from Andrews's trial would not have introduced rebuttal witnesses had the defense presented evidence of Andrews's prison conditions, Dissent at 107, 115, the dissent errs by conducting its own de novo review and failing to defer to the state court's factual findings under 28 U.S.C. § 2254(d)(2) and (e).

Supreme Court precedent, *Bell v. Cone*, 535 U.S. 685 (2002), *Williams v. Taylor*, 529 U.S. 362 (2000), and *Burger v. Kemp*, 483 U.S. 776 (1987). The court provided the following reasoning. In *Burger*, the Supreme Court held that counsel was not deficient even though he declined to present evidence of the defendant's neglectful, violent family or his mental and emotional deficiencies, because: (1) introducing such background evidence raised a risk that aggravating information would be introduced, and (2) counsel had adopted the reasonable strategy of minimizing his client's culpability in light of the co-defendant's dominance. *Id.* at 672–73 (citing *Burger*, 483 U.S. at 791–94). The California Supreme Court determined that Andrews's counsel had even more compelling justifications for not introducing background evidence than Burger's counsel, given that Burger endured a worse childhood than Andrews, was a teenager at the time of the murder, had committed only one murder, and was not primarily responsible for the decision to kill. *Id.* at 673.

Next, the California Supreme Court turned to *Bell v. Cone*, 535 U.S. 685 (2002). *In re Andrews*, 52 P.3d at 673. In *Bell*, counsel provided no penalty phase evidence at all and waived closing argument. *Id.* (citing *Bell*, 535 U.S. at 685). The Supreme Court concluded that counsel's strategy was reasonable, because evidence of defendant's normal childhood might have been perceived negatively by the jury, and because counsel's decision to waive closing argument prevented the lead prosecutor from depicting the defendant as a heartless killer. *Id.* (citing *Bell*, 535 U.S. at 699–702). The California Supreme Court noted that the counsel's strategy in *Bell* was similar to the strategy of Andrews's counsel: by providing little background information and giving only a

brief closing argument, counsel could reduce damaging rebuttal evidence. *Id.* at 673–74.

Finally, the California Supreme Court considered *Williams v. Taylor*, 529 U.S. 362 (2000), which held that counsel rendered ineffective assistance of counsel by failing to investigate defendant's nightmarish childhood, borderline mental retardation, and model behavior in prison. *Id.* at 674 (citing *Williams*, 529 U.S. at 395–96). The California Supreme Court distinguished this case, noting that counsel's failure in *Williams* to investigate was not based on strategy, as in Andrews's case, but due to counsel's erroneous understanding of the law. *Id.* The state court also noted that in *Williams*, there was no tactical reason to withhold evidence and there was virtually no risk of damaging rebuttal, as in this case. *Id.* at 674–75.

The California Supreme Court therefore concluded that then-existing Supreme Court precedent was consistent with its conclusion that Andrews had not established that "in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance." *Id.* at 668 (internal quotation marks and alterations omitted).**[9]**

---

**[9]** The dissent argues that the California Supreme Court erred in relying on *Burger*, *Bell*, and *Williams* in concluding that Andrews's counsel were not deficient. Dissent at 104–106, 110–111. This criticism is meritless, however, because it is based on de novo review rather than the deference required under AEDPA. For example, in concluding that "[t]he California Supreme Court's reliance on *Burger* is unreasonable," Dissent at 104–105, the dissent takes a de novo approach that is not permitted under AEDPA, where a court must consider whether "fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents," *Richter*, 562 U.S. at 102. Similarly, instead of determining whether any fairminded jurist could conclude there is a "principled

4

The California Supreme Court next turned to the prejudice prong. As explained in greater detail below, the California Supreme Court determined, based on its review of the evidence adduced at the reference hearing and the rebuttal evidence that could have been introduced during the penalty phase, that "it is not 'reasonabl[y] proba[ble]' petitioner was prejudiced by counsel's rejection of a defense premised on evidence of petitioner's upbringing, the Alabama prison conditions he experienced, and his mental health in light of the circumstances of the crimes, given the ambiguous nature of some mitigating evidence and the substantial potential for damaging rebuttal." *Id.* at 671 (quoting *Strickland*, 466 U.S. at 694).

"Having considered the record of the hearing, the referee's factual findings, and petitioner's original trial," the California Supreme Court concluded that Andrews "received constitutionally adequate representation, and any inadequacy did not result in prejudice." *Id.* at 659. Accordingly, the California Supreme Court denied Andrews's state habeas petition. *Id.* at 676.

---

distinction," *Murdoch v. Castro*, 609 F.3d 983, 991 (9th Cir. 2010) (en banc), between this case and *Williams*, the dissent misrepresents the California Supreme Court as holding that "a virtually nonexistent penalty phase investigation is reasonable so long as it is not based upon a misunderstanding of the law," and then rejects this absurd reading of *Williams*. Dissent at 110–111. "[I]t is not apparent how the [dissent's] analysis would have been any different without AEDPA." *Richter*, 562 U.S. at 101 (faulting the Ninth Circuit's de novo approach to habeas review).

5

After the California Supreme Court rejected Andrews's claims, Andrews filed a habeas petition in federal district court. His amended petition raised 32 claims, including multiple subclaims.

In a lengthy ruling on the merits of the petition, the district court denied 31 claims, but granted relief on Andrews's claim that his counsel were ineffective at the penalty phase of his trial for failing to investigate and present additional mitigating evidence. In reaching this conclusion, the district court did not apply the standard mandated by the Antiterrorism and Effective Death Penalty Act (AEDPA). Instead of determining whether the California Supreme Court's rejection of this ineffective assistance of counsel claim was "contrary to, or involved an unreasonable application of" *Strickland*, as required by 28 U.S.C. § 2254(d)(1), the district court reviewed the evidence produced by the referee on this issue de novo and concluded that counsel's "failure to adequately investigate and discover evidence of a life filled with abuse and privation is sufficient to establish prejudice under *Strickland*." *Cf. Richter*, 562 U.S. at 101 (criticizing the Ninth Circuit's review of a state court opinion under § 2254(d)(1) because it failed to give the deference due under AEDPA). The court granted Andrews's petition on this ineffective assistance of counsel claim, denied Andrews's other 31 claims, and granted a certificate of appealability (COA) on Andrews's claim that California's lethal injection protocol violates the Eighth Amendment (Claim 25).

Andrews timely appealed, challenging the district court's denials of Claim 25 and several uncertified claims. The state

cross-appealed the district court's grant of relief on Andrews's ineffective assistance of counsel claim. After briefing on his appeal was complete, Andrews moved for permission to brief an additional uncertified claim for habeas relief on the ground that it would violate the Eighth Amendment to execute him after a long delay from the date of his sentencing. We granted the motion.

## II

We review a district court's grant or denial of habeas relief de novo. *Moses v. Payne*, 555 F.3d 742, 750 (9th Cir. 2009).

## A

AEDPA applies to Andrews's federal habeas petition, which was filed after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 322, 336 (1997). Under AEDPA, a court may not grant a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), unless the state court's judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).[10]

---

[10] Neither party disputes that the claims in this case were "adjudicated on the merits" by the California Supreme Court, and that its decision constitutes the "last reasoned decision" of the state court with respect to those claims. *See Cheney v. Washington*, 614 F.3d 987, 993, 995 (9th Cir. 2010).

Under § 2254(d)(1), the relevant Supreme Court precedent includes only the decisions in existence "as of the time the state court renders its decision." *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (internal quotation marks and emphasis omitted); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("State-court decisions are measured against [the Supreme] Court's precedents as of the time the state court renders its decision." (internal quotation marks omitted)). Thus, Supreme Court cases decided after the state court's decision are not clearly established precedent under § 2254(d)(1) for purposes of evaluating whether the state court reasonably applied Supreme Court precedent.

A Supreme Court decision is not clearly established law under § 2254(d)(1) unless it "squarely addresses the issue" in the case before the state court, *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (per curiam), or "establish[es] a legal principle that 'clearly extends'" to the case before the state court, *Moses*, 555 F.3d at 754 (alterations omitted) (quoting *Van Patten*, 552 U.S. at 123); *see also Carey v. Musladin*, 549 U.S. 70, 76–77 (2006) (holding that Supreme Court cases evaluating state-sponsored courtroom conduct were not clearly established law governing private actor courtroom conduct). "[W]hen a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." *Murdoch*, 609 F.3d at 991. "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (internal quotation marks omitted). A principle is clearly established law governing the case "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded

disagreement on the question." *Id.* at 1706–07 (internal quotation marks omitted).

A state court decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405. An "unreasonable application" of Supreme Court precedent is not one that is merely "incorrect or erroneous," *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see also Williams*, 529 U.S. at 410; rather, "[t]he pivotal question is whether the state court's application of the [relevant Supreme Court precedent] was *unreasonable*," *Richter*, 562 U.S. 86 at 101 (emphasis added). "Under § 2254(d), a habeas court must determine what arguments or theories supported" the state court's decision, *id.* at 102, and if "'fairminded jurists could disagree' on the correctness of the state court's decision," that decision is not unreasonable, *id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The Supreme Court has made clear that § 2254(d) sets forth a "highly deferential standard . . . , which demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (internal quotation marks omitted). "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings," but only "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents" and "goes no further." *Richter*, 562 U.S. at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* In a nutshell, "[i]f this

standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

## B

The clearly established federal law for ineffective assistance of counsel claims, as determined by the Supreme Court, is *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. *See Pinholster*, 563 U.S. at 189. *Strickland* concluded that, under the Sixth Amendment, the accused has the right to the effective assistance of counsel at trial and during capital sentencing proceedings. 466 U.S. at 684–87. A petitioner claiming ineffective assistance of counsel must prove: (1) that "counsel's performance was deficient," and (2) that "the deficient performance prejudiced the defense." *Id.* at 687.

In determining whether a state court's adjudication of an ineffective assistance of counsel claim was an unreasonable application of Supreme Court precedent, we may consider how the Supreme Court itself has applied *Strickland* to other factual contexts, but this is merely "illustrative of the proper application of [*Strickland*'s] standards." *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *see also Pinholster*, 563 U.S. at 196 n.17; Brian R. Means, *Federal Habeas Manual* § 3:29 (2014). The Supreme Court has warned us not to derive "strict rules" from its cases applying *Strickland* de novo because "the *Strickland* test 'of necessity requires a case-by-case examination of the evidence.'" *Pinholster*, 563 U.S. at 196 & n.17 (quoting *Williams*, 529 U.S. at 391). Further, Supreme Court cases decided on de novo review "offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking" or defense counsel was deficient, and so are not directly applicable to a

federal court's review under § 2254(d)(1) of a habeas petitioner's claim that a state court unreasonably applied *Strickland*. *Id.* at 202. Indeed, a state court's application of *Strickland* may be objectively reasonable based on clearly established Supreme Court precedent at the time of its decision even if the Supreme Court's subsequent applications of *Strickland* suggest a different result. By contrast, when the Supreme Court addresses the AEDPA question whether a state court's adjudication of an ineffective assistance of counsel claim was an unreasonable application of *Strickland*, its reasoning may guide a federal court's AEDPA analysis when the facts of the Supreme Court case (including the prevailing professional norms at the time of the defendant's trial) are analogous to the case before the court.

Under *Strickland*, deficient performance is performance that falls "below an objective standard of reasonableness" and is thus outside of "the range of competence demanded of attorneys in criminal cases." 466 U.S. at 687–88 (internal quotation marks omitted). The objective measure of counsel's performance is "reasonableness under prevailing professional norms." *Id.* at 688. Therefore, counsel's performance is deficient only if it falls below the standard of then prevailing professional norms at the time of the trial. *Id*. In *Pinholster*, for instance, the Supreme Court rejected the dissent's argument that counsel's performance was defective where the dissent provided no evidence that counsel's chosen mitigation strategy was "inconsistent with the standard of professional competence in capital cases that prevailed in Los Angeles in 1984." 563 U.S. at 196; *see also Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam) (holding that the Sixth Circuit had improperly relied on the much more detailed 2003 ABA Guidelines "announced 18 years after Van Hook went to trial"). Therefore, a court may not

evaluate whether counsel's performance fell below prevailing professional conduct at the time of a defendant's trial by reference to Supreme Court opinions that rely on later-developed professional norms.

The Supreme Court has also provided guidance for applying *Strickland* to determine whether counsel's "deficient performance prejudiced the defense," *Strickland*, 466 U.S. at 687, at the penalty phase of a capital case. Illustrative Supreme Court precedent indicates that a court generally proceeds through three steps: (1) evaluating and weighing the totality of the available mitigation evidence, *see Williams*, 529 U.S. at 397–98; *Pinholster*, 563 U.S. at 197–202; (2) evaluating and weighing the aggravating evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced, *Williams*, 529 U.S. at 397–98; *Pinholster*, 563 U.S. at 197–202, and (3) reweighing the evidence in aggravation against the totality of available mitigating evidence, *see Sears v. Upton*, 561 U.S. 945, 955–56 (2010) (per curiam); *Wiggins*, 539 U.S. at 534; *Williams*, 529 U.S. at 397–98, to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," *Strickland*, 466 U.S. at 695. We explain the Supreme Court's guidance on each of these steps.

1

The first step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is evaluating "the totality of the available mitigation evidence." *Williams*, 529 U.S. at 397–98. The evidence to be evaluated includes both evidence that was actually presented at

sentencing and evidence that a competent attorney would have introduced. *See Wiggins*, 539 U.S. at 534–35. A court may assume that a competent attorney would have considered presenting all of the evidence adduced in post-conviction proceedings. *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam).

Mitigation evidence is a broad category, as a jury must be permitted to consider all relevant mitigating factors. *Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (plurality opinion); *Eddings v. Oklahoma*, 455 U.S. 104, 110–12 (1982). The Supreme Court has identified several non-exclusive categories of mitigation evidence, focusing primarily on evidence that aids the jury's evaluation of a defendant's moral culpability. *See Wiggins*, 539 U.S. at 535. For instance, evidence of a defendant's disadvantaged background may lead a jury to conclude the defendant is "less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). Thus, evidence that a defendant had a childhood "filled with abuse and privation," including being raised by parents who were eventually imprisoned for criminal child neglect, could influence a jury's appraisal of the defendant's moral culpability. *Williams*, 529 U.S at 395, 398; *see also Wiggins*, 539 U.S. at 535 (mitigating evidence included evidence that the defendant suffered severe privation and abuse as a child, had an alcoholic and absent mother, was physically and sexually abused in foster care, and was homeless for a brief period); *Rompilla v. Beard*, 545 U.S. 374, 391–93 (2005) (mitigating evidence included evidence that the defendant was raised in a slum by severely abusive, alcoholic parents, who did not provide for him and isolated him).

Similarly, evidence of a defendant's mental or emotional difficulties may lead a jury to conclude that a defendant is less culpable than defendants without such difficulties. *Penry*, 492 U.S. at 319. For instance, evidence that a defendant is "borderline mentally retarded," *Williams*, 529 U.S. at 396 (internal quotation marks omitted), or has severe PTSD from military combat, *see Porter v. McCollum*, 558 U.S. 30, 35–36 & n.4, 43–44 (2009), or has severe learning and behavioral disabilities, frontal lobe injuries, and brain damage from drug and alcohol abuse, *see Sears*, 561 U.S. at 948–49, is potentially mitigating.

Evidence of conduct or behavior demonstrating the defendant's good character may also be mitigating. In *Williams*, the Court gave weight to evidence that the defendant had turned himself in, alerted police to a previously undetected crime, expressed remorse, cooperated with police, and behaved well in prison. 529 U.S. at 369, 396, 398. In *Belmontes*, the Court noted mitigation evidence that the defendant had maintained strong relationships with family members in spite of his terrible childhood, and that while in prison, he assisted others through a prison religious program and rose to second in command in a fire crew. 558 U.S. at 21.

After identifying the evidence that the petitioner claims to be mitigating, a court must weigh its strength by assessing its likely impact on a jury. This weighing process includes evaluating whether the evidence's impact on the jury might be aggravating rather than mitigating. *See Pinholster*, 563 U.S. at 201–02. The Supreme Court has indicated that courts can consider the fact that mitigation "may be in the eye of the beholder," and juries may find that some evidence offered as mitigation cuts the other way. *Burger*, 483 U.S. at

794 (alterations and internal quotation marks omitted).  In *Burger*, the Court noted that "[o]n one hand, a jury could react with sympathy over the tragic childhood" of the defendant, while on the other hand, the same testimony could establish the defendant's "unpredictable propensity for violence" that resulted in murder.  *Id.* (internal quotation marks omitted).  Similarly, evidence of mental and emotional problems might suggest an increased likelihood that a defendant would be dangerous in the future.  *See Pinholster*, 563 U.S. at 201 (noting that evidence of the defendant's family background, his substance abuse, and his mental health issues, was "by no means clearly mitigating, as the jury might have concluded that [the defendant] was simply beyond rehabilitation").  The Court has also observed that evidence of the defendant's normal youth might, in the jury's eyes, establish greater moral culpability on the part of the defendant.  *See Bell*, 535 U.S. at 701–02.

2

The second step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is evaluating the weight of the aggravating evidence and any rebuttal evidence that the government could have adduced had the mitigating evidence been introduced.  *See Williams*, 529 U.S. at 397–98; *Pinholster*, 563 U.S. at 197–202.   Aggravating evidence may include evidence relating to the circumstances of the crime.   Thus, in *Strickland*, the Court found the aggravating evidence to be "overwhelming" where the defendant had repeatedly stabbed the three murder victims during a robbery.  466 U.S. at 674, 700.  Similarly, where the record showed that the defendant had bludgeoned a woman to death with 15 to 20 blows of a steel dumbbell bar to steal goods worth $100, the Supreme

Court agreed with the state court that the aggravating evidence was "simply overwhelming" and determined that counsel's failure to introduce certain mitigating evidence was not prejudicial. *Belmontes*, 558 U.S. at 15–16, 26–27 (internal quotation marks omitted). In *Van Hook*, the Supreme Court gave weight to evidence that the murder was committed in the course of a scheme to rob homosexual men by luring them into secluded settings. 558 U.S. at 12–13. In doing so, the Court clarified that the weight, not the number, of the aggravating factors was important. *Id.*

Evidence about a defendant's prior criminal history is also aggravating and can be introduced in rebuttal, and a severe criminal history carries great weight. *See Woodford v. Visciotti*, 537 U.S. 19, 26–27 (2002) (criminal history that included "the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby," combined with the circumstances of the crime, was "overwhelming" and "devastating" aggravating evidence); *accord Bell*, 535 U.S. at 700 & n.5 (defense counsel reasonably feared the prosecution would elicit information about defendant's criminal history, which included robberies, in rebuttal); *Burger*, 483 U.S. at 793 (defense counsel reasonably feared the prosecution would introduce the defendant's juvenile criminal history in rebuttal, when he had a clean adult record). Evidence that a defendant had previously committed another murder may be "the most powerful imaginable aggravating evidence." *Belmontes*, 558 U.S. at 28 (internal quotation marks omitted).

Rebuttal evidence may also directly undermine the value of the mitigation evidence. For example, the Supreme Court noted in *Pinholster* that it would be "of questionable mitigating value" for defense counsel to introduce expert

testimony diagnosing a defendant with bipolar mood disorder and seizure disorders, because such evidence would invite rebuttal by a state expert, who could reject the diagnosis of bipolar disorder and offer a different diagnosis of antisocial personality disorder. *Pinholster*, 563 U.S. at 177, 201.

3

The third step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is to "reweigh the evidence in aggravation against the totality of available mitigating evidence," *Wiggins*, 539 U.S. at 534, in order to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," *Strickland*, 466 U.S. at 695. A "reasonable probability" is a level of probability that "undermine[s] confidence in the outcome." *Id.* at 694. However, counsel's deficient performance is not prejudicial merely because the court cannot "rule out" the possibility that the sentencer would have imposed a sentence of life in prison instead of the death penalty. *Belmontes*, 558 U.S. at 20, 27 (internal quotation marks omitted); *see also Richter*, 562 U.S. at 111 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome . . . ."). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). Thus, "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* (quoting *Strickland*, 466 U.S. at 697).

The Court has found a reasonable probability of a different outcome when scant and weak aggravating evidence could have been presented in rebuttal to strongly mitigating evidence. *See Wiggins*, 539 U.S. at 534–36, 537–38 (holding that there was a reasonable probability that the jury would have reached a different result at sentencing had it heard powerful mitigating evidence regarding the defendant's childhood background, when the state could have presented only weak rebuttal evidence). By contrast, the Court has found no prejudice when the aggravating evidence is overwhelming, even though the mitigating evidence is strong. *See Visciotti*, 537 U.S. at 26–27 (holding that there was no reasonable probability of a different result when the mitigating evidence, including the defendant's "troubled family background" and possible seizure disorder, did not outweigh the "overwhelming" aggravating factors, including the circumstances of the crime and potential rebuttal evidence of prior offenses).

In reweighing aggravating and mitigating evidence, the Court has also examined whether mitigating evidence would be merely cumulative or would have significantly altered the information provided to the sentencer. *See Strickland*, 466 U.S. at 699–700; *Porter*, 558 U.S. at 41–42. In *Strickland*, the new information "would barely have altered" the picture presented at sentencing, and the Court found no prejudice. 466 U.S. at 699–700. Similarly, in *Belmontes*, the Court concluded that merely cumulative evidence regarding a petitioner's difficult childhood, and expert testimony regarding a petitioner's mental state "seeking to explain his behavior, or putting it in some favorable context" would be unlikely to outweigh the facts of a brutal murder, and would be even less likely to outweigh evidence that the defendant had committed a prior murder. 558 U.S. at 22–24, 27–28.

Accordingly, the Court concluded that any failure of counsel to present additional mitigating evidence was not prejudicial. *Id.* at 27.

These Supreme Court opinions illustrate that under *Strickland*'s prejudice prong, cumulative mitigating evidence does not support a conclusion that there would be a reasonable probability of a different outcome. New mitigating evidence can support such a conclusion only if it is sufficiently strong, and the known or additional aggravating evidence is not overwhelming.

C

In light of this guidance, we now evaluate the California Supreme Court's rejection of Andrews's claim that he was prejudiced by his counsel's failure to investigate and present additional mitigating evidence at the penalty phase of his trial. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). We must determine whether this decision was "contrary to, or involved an unreasonable application of," *Strickland* or other Supreme Court precedent in existence at the time of its opinion. § 2254(d)(1); *see Pinholster*, 563 U.S. at 182–83.

In considering whether any deficiency by Andrews's counsel was prejudicial, the California Supreme Court correctly followed *Strickland* in asking whether, even if counsel were deficient, Andrews's defense was not prejudiced by any such deficiency because a different result was not reasonably probable. *See In re Andrews*, 52 P.3d at 671 (quoting *Strickland*, 466 U.S. at 694). The California

Supreme Court then reasonably carried out the three steps indicated by Supreme Court opinions for evaluating prejudice under *Strickland* at the penalty phase.[11]

1

The court first considered the totality of the mitigating evidence presented at trial, as well as what mitigating evidence could have been presented by a competent attorney, based on the six-year review and report by the referee. *See Williams*, 529 U.S. at 397–98. The court reviewed all of the mitigating evidence that Andrews presented, including Andrews's family background, *In re Andrews*, 52 P.3d at 660, 670, incarceration in Mt. Meigs and in Alabama prisons,[12] *id.*

---

[11] Andrews argues that the California Supreme Court failed to apply the correct legal standard for determining whether counsel provided deficient performance at the penalty phase. Specifically, Andrews argues that the California Supreme Court failed to follow *Tennard v. Dretke* and *Smith v. Texas*, which hold that evidence can be mitigating even if it is not "uniquely severe" or does not have a "nexus" to the crime. 542 U.S. 274, 287 (2004); 543 U.S. 37, 44–45 (2004). This argument misconstrues the California Supreme Court opinion. In determining that counsel could have made a strategic decision not to present tangential evidence that could cut both ways, the court expressly considered the purportedly mitigating evidence. On its face, such an approach is not equivalent to holding that certain evidence is per se not mitigating and declining to consider it. *Cf. Eddings*, 455 U.S. at 114–15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence. But [courts] may not give it no weight by excluding such evidence from their consideration.").

[12] Andrews's claim that the state court failed to consider his experiences at Mt. Meigs, is not supported by the record. The state court detailed Andrews's experiences at Mt. Meigs when discussing mitigating evidence that could have been presented, noting that "[a]t Mt. Meigs, [Andrews] encountered appalling conditions" and detailing the referee's findings that Andrews "was subjected to beatings, brutality, inadequate conditions and

at 660–61, 670–71, and mental health evidence, *id.* at 661–62, 670, observing that the similar types of mitigating evidence have been considered in Supreme Court precedent, *id.* at 672–75; *see Penry*, 492 U.S. at 319; *Williams*, 529 U.S. at 395–98.

The California Supreme Court then evaluated the strength of this mitigating evidence by considering, among other things, whether it might be viewed by a jury as aggravating. *See Burger*, 483 U.S. at 793; *Pinholster*, 563 U.S. at 201–02. The court reasonably concluded that much of the evidence identified as mitigating "was not conclusively and unambiguously mitigating," and it evaluated the possibility that the evidence could be rebutted or used to Andrews's disadvantage, or that cross examination might "deflate the mitigating impact" of the evidence. *In re Andrews*, 52 P.3d at 670 & n.9. The court reasonably observed that a jury could have determined that Andrews's family background did not reduce his moral culpability, given that Andrews was raised in a non-abusive, stable family situation. *Id.* at 670; *cf. Bell*, 535 U.S. at 701–02 (suggesting that evidence of a normal youth might "cut the other way"). The court reasonably concluded that "[Andrews] did not suffer a home environment that would place his crimes in any understandable context or explain his resorting to crime every

_____

sexual predators," that "[h]is passiveness and small physique caused him to be a target of older, tougher boys, from whom no protection or separation was provided," and that "Mt. Meigs failed to provide any meaningful rehabilitative or educational opportunities." *In re Andrews*, 52 P.3d at 660–61 (internal quotation marks omitted). The state court also noted that expert testimony would have addressed his drug use at Mt. Meigs. *Id.* at 661. Moreover, the state court's use of the term "prison conditions" in its opinion is consistent with its use in the referee's report, where the term referred to conditions both in prison and Mt. Meigs.

time he was released or escaped from prison." *In re Andrews*, 52 P.3d at 670.

In addition, the California Supreme Court reasonably determined that the evidence regarding the prison conditions was double-edged. On the one hand, the prison conditions evidence left it in "no doubt [that Andrews] endured horrifically demeaning and degrading circumstances." *Id*. On the other hand, the evidence would be presented primarily through the testimony of Andrews's former fellow inmates, who had serious criminal records that could "draw[] an unfavorable comparison" with Andrews. *Id.* at 671. "Many had themselves engaged in brutality while in prison and escaped with some frequency," also similar to Andrews. *Id*. Moreover, no matter how the prison conditions evidence was presented, "[r]ather than engendering sympathy, the evidence could well have reinforced an impression of him as a person who had become desensitized and inured to violence and disrespect for the law."[13] *Id.*; *cf. Pinholster*, 563 U.S. at 201–02.

The dissent claims that the California Supreme Court was unreasonable in concluding that the Mt. Meigs evidence could have constituted a double-edged sword because "[t]he jury already knew from Andrews's heinous crimes of conviction and from the stipulated prior convictions that Andrews was antisocial and 'had become desensitized and inured to violence and disrespect for the law.'" Dissent at

---

[13] Andrews argues that the state court made an unreasonable determination of the facts, *see* § 2254(d)(2), in holding that the prison conditions evidence could be aggravating. We reject this argument, because the state court's conclusion is a reasonable application of the prejudice standard elaborated by *Strickland* and its progeny, not a factual finding. *Cf. Pinholster*, 563 U.S. at 201–02.

119–120. However, the dissent's conclusion is factually incorrect. Because the stipulation presented to the jury did not describe the facts of each of the offenses underlying Andrews's prior convictions, the jury did not hear that Andrews held a woman hostage with a gun to her head when robbing a laundry business or that the taxi driver in the 1968 robbery heard Andrews say "[l]et's shoot him" and then fired at least two shots at him. *See supra* at 21–22. Accordingly, the California Supreme Court did not err in concluding that evidence of prison conditions was double-edged.

2

Consistent with Supreme Court precedent, the California Supreme Court not only assessed the weight of the mitigating evidence and its likely impact on a jury but also evaluated the weight of the aggravating evidence at trial, as well as any additional rebuttal evidence that could have been introduced. *See Williams*, 529 U.S. at 397–98; *Belmontes*, 558 U.S. at 20, 24–28. Turning to the circumstances of Andrews's crimes, the California Supreme Court stated that the murders showed a "callous disregard for human life." *In re Andrews*, 52 P.3d at 671; *cf. Strickland*, 466 U.S. at 674, 700; *Belmontes*, 558 U.S. at 15, 26–27. Andrews did not impulsively react to a situation that got out of hand; rather, he interacted with the victims in a calm and normal manner before torturing and killing them. *In re Andrews*, 52 P.3d at 671. He also did more than simply kill the victims. He raped and sodomized Brandon before murdering her, and he also murdered Wheeler and Chism with "considerable violence and evident sangfroid." *Id.* The state court also considered that, as rebuttal evidence, the prosecution could have presented the details of Andrews's criminal history, *cf. Bell*, 535 U.S. at 700 & n.5; *Burger*, 483 U.S. at 793, from which the jury

might conclude Andrews was "aggressive and desensitized to violence," *In re Andrews*, 52 P.3d at 669. The jury might also have concluded that this "pattern of criminality" showed Andrews "would pose a danger to others if he were sentenced to life imprisonment."[14] *Id*. Also, the references to Andrews's multiple escapes from prison might have been "inflammatory." *Id*.

Finally, the California Supreme Court reasonably concluded that the prosecution could have presented its own mental health experts in rebuttal, and could have used the mental health evidence to Andrews's disadvantage on cross examination. *Id.* at 670. The court noted the referee's findings that prosecution experts could have testified that Andrews had normal intelligence and did not suffer brain

---

[14] Andrews argues that the state court's conclusion that the evidence gave rise to the inference of future dangerousness was an unreasonable determination of the facts. He argues that the prison stabbings, laundry robbery, and conditioning to violence during his prison experiences do not support such an inference, pointing to mitigating facts found by the referee, including that in some incidents, Andrews was defending himself against inmates who had been threatening him. We disagree. The state court considered these mitigating facts (such as evidence that in prison Andrews was "the prey rather than the predator" and acted in self defense), *see In re Andrews*, 52 P.3d at 660–61, and reasonably concluded that the evidence that Andrews was conditioned to violence during his prison experiences was an aggravating, not mitigating, circumstance, *see Burger*, 483 U.S. at 793 (noting that evidence of a petitioner's troubled family background could also "suggest violent tendencies" that could affect the jury adversely). Because the state court reasonably concluded that the jury could have found future dangerousness even had the mitigating evidence been introduced, the state court did not unreasonably apply Supreme Court precedent in weighing how the evidence might impact a jury.

damage, but had antisocial personality traits.[15]   *Id.*; *cf.*
*Pinholster*, 563 U.S. at 173, 201.  Nor was the state court
unreasonable in concluding that Andrews's experts'
testimony could backfire.  For instance, the court noted that
the "compelling" testimony from one of Andrews's expert
psychiatric witnesses, opining that Andrews's prison
experience caused him to react with rage to perceived insults,
could cause a jury to conclude that Andrews "was unable to
control lethal impulses on the slightest provocation." *In re
Andrews*, 52 P.3d at 670; *cf. Pinholster*, 563 U.S. at 201–02.
Finally, the presentation of the mental health evidence would
have given the prosecutor additional opportunities to repeat
the circumstances of these crimes as well as Andrews's past
criminality. *In re Andrews*, 52 P.3d at 670.

3

After evaluating the mitigating and aggravating evidence,
the California Supreme Court re-weighed it and assessed
whether it was reasonably probable that, in the absence of any
deficient performance by counsel, the sentencer "would have
concluded that the balance of aggravating and mitigating
circumstances did not warrant death." *Strickland*, 466 U.S.
at 695; *see In re Andrews*, 52 P.3d at 671–75.  The state court
applied the relevant Supreme Court precedent, and concluded
that Andrews was not "prejudiced by counsel's rejection of

---

[15] Andrews argues that the state court unreasonably applied *Eddings*,
455 U.S. at 114–15, in concluding that a diagnosis of antisocial
personality disorder is not mitigating. *Eddings* is not on point, because it
merely held that a court cannot prevent a jury from hearing such evidence.
*Id.*  The state court did not unreasonably apply *Eddings*, or any other
Supreme Court precedent, by observing that evidence that Andrews had
antisocial personality disorder might make him less sympathetic to the
jury. *In re Andrews*, 52 P.3d at 670–71.

a defense premised on evidence of [Andrews]'s upbringing, the Alabama prison conditions he experienced, and his mental health in light of the circumstances of the crimes, given the ambiguous nature of some mitigating evidence and the substantial potential for damaging rebuttal." *In re Andrews*, 52 P.3d at 671. Indeed, the California Supreme Court concluded that "[w]ith respect to the question of prejudice" the record "contains no indication the jury was inclined to sentence petitioner to life imprisonment and might have been persuaded by additional or alternate mitigation evidence." *Id.* at 675–76. Accordingly, the California Supreme Court reasonably concluded that even if counsel were deficient, Andrews's defense was not prejudiced by any such deficiency. *Id.* Because this is not an objectively unreasonable application of *Strickland*, the district court erred in granting Andrews relief on this issue.

Relying on the Supreme Court's decisions in *Williams* and *Porter*, Andrews argues that the California Supreme Court's decision on the issue of prejudice was an unreasonable application of *Strickland*.[16] We disagree.

In *Williams*, the police found a man dead in his residence. 529 U.S. at 367. There was no indication of a struggle so local officials concluded that the cause of death was alcohol poisoning and closed the case. *Id.* The defendant, who had been arrested for an unrelated offense, wrote a letter to the police confessing he had killed a man by striking him in the chest and back after an argument, thus "alerting police to a

---

[16] While Andrews cites other Supreme Court and Ninth Circuit cases, his argument focuses primarily on *Williams* and *Porter*. Because other cases cited by Andrews are non-binding, not factually analogous, or both, we do not address them here.

crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that." *Id.* at 367–68 & n.1, 398.[17]

The defendant's counsel began to prepare for the penalty phase only a week before trial, and even then counsel did not review defendant's juvenile and social services records because counsel incorrectly believed that state law barred access to these records. *Id.* at 373, 395. Counsel thus failed to discover documents that "graphically describe[d] [defendant's] nightmarish childhood." *Id.* at 395. The evidence showed that defendant's "parents had been imprisoned for the criminal neglect of [defendant] and his siblings, that [defendant] had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody." *Id.* The records

---

[17] The dissent relies on Justice Rehnquist's concurring and dissenting opinion in *Williams*, which described additional aggravating factors beyond the crime itself. *See* Dissent at 114–115 (stating that the jury heard evidence that "Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw") (citing *Williams*, 529 U.S. at 418 (Rehnquist, C.J., concurring in part and dissenting in part)). But under AEDPA, neither concurring nor dissenting opinions, nor circuit court decisions (particularly one reversed by the Supreme Court, *see* Dissent at 114–115), constitute clearly established Supreme Court precedent. *See Williams*, 529 U.S. at 412 (stating that only the Supreme Court's "holdings, as opposed to the dicta" constitute clearly established Federal law); *Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) ("As we have repeatedly emphasized, however, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting 28 U.S.C. § 2254(d)(1))).

revealed that defendant's home had urine and feces on the floor; defendant's parents "were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them"; "[t]he children were all dirty and none of them had on under-pants"; and in one instance "[t]he children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey." *Id.* at 395 n.19.

Nor did counsel introduce other mitigating evidence readily apparent from the record, such as the fact that defendant was "borderline mentally retarded." *Id.* at 396. Counsel also failed to "seek prison records recording [defendant's] commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described [defendant] as among the inmates 'least likely to act in a violent, dangerous or provocative way.'" *Id.* In addition, counsel failed to return the phone call of a character witness who had offered to testify "that he had visited [defendant] frequently when [defendant] was incarcerated as part of a prison ministry program, that [defendant] 'seemed to thrive in a more regimented and structured environment,' and that [defendant] was proud of the carpentry degree he earned while in prison." *Id.*

Finally, at sentencing, "[t]he weight of defense counsel's closing . . . was devoted to explaining that it was difficult to find a reason why the jury should spare [defendant's] life." *Id.* at 369; *see also id.* at 369 n.2 (quoting defense counsel as telling the jury "'I will admit too that it is very difficult to ask you to show mercy to a man who maybe has not shown much mercy himself. I doubt very seriously that he thought much about mercy when he was in [the victim's] bedroom that

night with him. . . . . Admittedly it is very difficult to get us and ask that you give this man mercy when he has shown so little of it himself.'"). The Supreme Court held that the state court applied the wrong legal standard in determining prejudice because it required "a separate inquiry into fundamental fairness," *id.* at 393, even when the petitioner showed there was a reasonable probability of a different outcome, *id.* at 393–95. Therefore, the Court applied *Strickland* de novo to these facts, *id.* at 397–98; *see also Pinholster*, 563 U.S. at 202.

The state court here discussed *Williams* at length and reasonably distinguished it as having "substantially dissimilar facts." *In re Andrews*, 52 P.3d at 675. In *Williams*, for instance, the defense counsel could have introduced strong character evidence regarding his exemplary conduct in prison, 529 U.S. at 398, but no comparable evidence of good character was present in Andrews's case.[18] The defendant's "nightmarish childhood" in *Williams*, 529 U.S. at 395, was far worse than Andrews's relatively stable family background, *see In re Andrews*, 52 P.3d at 674. The defendant in *Williams* was "borderline mentally retarded," 529 U.S. at 396, 398 (internal quotation marks omitted), while the prosecution could have presented evidence that Andrews was not mentally impaired, but rather had antisocial personality traits, *In re Andrews*, 52 P.3d at 670. Although the prosecutor in *Williams* could have introduced rebuttal evidence that defendant had been "thrice committed to the juvenile system—for aiding and abetting larceny when he was 11 years old, for pulling a false fire alarm when he was

---

[18] Andrews points to evidence that he appeared to adjust well to the Alabama prison system when conditions permitted, but this observation is weaker than the evidence in *Williams*. *See* 529 U.S. at 396.

12, and for breaking and entering when he was 15," 529 U.S. at 396, such evidence has much less weight compared to Andrews's robbery-murder, hostage taking, and history of escapes from prison, *In re Andrews*, 52 P.3d at 675. Finally, the circumstances of the crime in *Williams* were less brutal than Andrews's rape and triple murder. *Id.*[19] Because the facts of *Williams* are dissimilar, the Supreme Court's determination in *Williams* that counsel's ineffective assistance was prejudicial does not make the state court's contrary conclusion here unreasonable. *See Richter*, 562 U.S. at 101–02; *see also Pinholster*, 563 U.S. at 202–03.

Andrews also argues that the California Supreme Court's decision was unreasonable in light of *Porter*. Although *Porter* was decided years after the California Supreme Court's opinion in this case, we give its prejudice analysis careful consideration, because *Porter* considered prejudice under AEDPA, and therefore provides direction for determining what constitutes an unreasonable application of the prejudice prong of *Strickland* under AEDPA. Nevertheless, we conclude that *Porter* does not help Andrews here.

---

[19] The dissent fails to engage with these distinctions and the evidence at issue. Instead, the dissent conducts a de novo review, and concludes that the aggravating evidence admitted at trial and the evidence that could have been offered in rebuttal against Andrews was "no greater than the aggravating evidence in *Williams*." Dissent at 115. The dissent misunderstands our role. We must determine whether the California Supreme Court's application of *Williams* was objectively unreasonable under 28 U.S.C. § 2254(d)(1), not whether we would have reached a different result under de novo review. "In order for a state court's decision to be an unreasonable application of [the Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, No. 16-1177, 2017 WL 2507375, at *3 (U.S. June 12, 2017) (internal quotation marks omitted).

In *Porter*, the defendant was convicted of two counts of first-degree murder for shooting his former girlfriend and her boyfriend. 558 U.S. at 31. The evidence suggested that "this was a crime of passion" and "that [defendant] was drinking heavily just hours before the murders." *Id.* at 38. The defendant was convicted of both murders, and the jury recommended the death sentence. *Id.* at 32. The state supreme court affirmed, but struck the "heinous, atrocious, or cruel aggravating factor," because the evidence was "consistent with the hypothesis that [defendant's] was a crime of passion, not a crime that was meant to be deliberately and extraordinarily painful." *Id.* at 33.

The defendant represented himself during the guilt phase, *id.* at 32, and his counsel "had only one short meeting with [defendant] regarding the penalty phase," *id.* at 39. As the Supreme Court explained, "counsel did not even take the first step of interviewing witnesses or requesting records." *Id.* As a result, the defendant's counsel failed to present evidence about "(1) [defendant's] heroic military service in two of the most critical—and horrific—battles of the Korean War," *id.* at 41, which earned him two Purple Hearts, the Combat Infantryman Badge, and other decorations, *id.* at 35; "(2) his struggles to regain normality upon his return from war," *id.* at 41, which led to excessive drinking, *id.* at 36; "(3) his childhood history of physical abuse," *id.* at 41, during which he was subjected to routine beatings and regularly watched his father beating his mother, *id.* at 33; and "(4) his brain abnormality, difficulty reading and writing, and limited schooling," *id*. at 41.

The Supreme Court determined that the state court unreasonably applied *Strickland* in holding that the defendant was not prejudiced by counsel's failure to introduce this

mitigating evidence. The Court held that the mitigating evidence was strong, while the weight of the evidence in aggravation was less substantial. *Id.* The Court also held that the state court was unreasonable in discounting the defendant's childhood abuse and military service. *Id.* at 43. It was "unreasonable to conclude that [defendant's] military service would be reduced to inconsequential proportions, simply because the jury would also have learned that [defendant] went AWOL on more than one occasion." *Id.* (internal citation and quotation marks omitted). The Court reasoned that "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as [defendant] did," and that the "relevance of [defendant's] extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on [defendant]." *Id.* 43–44. "To conclude otherwise," the Court opined, "reflects a failure to engage with what [defendant] actually went through in Korea." *Id.* at 44. Further, the Court held that the state court was "unreasonable to discount to irrelevance the evidence of [defendant's] abusive childhood, especially when that kind of history may have particular salience for a jury evaluating [defendant's] behavior in his relationship with [his former girlfriend]." *Id.* at 43.

The Court's reasoning in *Porter* does not lead to the conclusion that the California Supreme Court unreasonably applied the prejudice prong of *Strickland* here. Unlike the state court in *Porter*, the California Supreme Court considered all mitigation evidence in the record and did not fail to consider or "discount to irrelevance" significant evidence. *See id*. The most important mitigation evidence in

*Porter*, that the defendant served in "the most critical—and horrific—battles of the Korean War," *see id.* at 41, is far stronger than the mitigation evidence at issue here. Moreover, Andrews did not have an abusive home life, and there is no evidence that his murders in this case were crimes of passion for which childhood abuse would have "particular salience for a jury" in evaluating his behavior. *See id.* at 43.

Further, the aggravating circumstances in *Porter* were different and less weighty than those in this case. Indeed, *Porter* noted that the state court had stricken the "heinous, atrocious, or cruel" aggravating factor because the evidence in the record was "consistent with the hypothesis that Porter's was a crime of passion, not a crime that was meant to be deliberately and extraordinarily painful," *id.* at 33, while here the California Supreme Court found that Andrews's brutal rape and strangulation of Brandon, and the shooting and strangling deaths of the other victims, evidenced a "callous disregard for human life" and were accomplished with "considerable violence and evident sangfroid," *In re Andrews*, 52 P.3d at 671.[20] Because *Porter* is factually distinct from this case, it has little bearing on the question whether the state court unreasonably applied the prejudice prong of *Strickland*.[21]

---

[20] The dissent claims that the prosecutor presented "a strong case in aggravation" in *Porter*, and therefore the conclusion in *Porter* must apply in this case. Dissent at 118. But unlike the case before us, *Porter* held that the sentencing judge had misjudged the weight of the aggravating evidence, and "the weight of evidence in aggravation is not as substantial as the sentencing judge thought." *Porter*, 558 U.S. at 41. The aggravating evidence in this case cannot similarly be minimized.

[21] Andrews also urges us to apply our decision in *Doe v. Ayers*, 782 F.3d 425 (9th Cir. 2015), where we concluded that the defendant was prejudiced by counsel's deficient performance in failing to investigate and

*Woodford v. Visciotti*, a Supreme Court case that provides direction for determining under AEDPA what constitutes an unreasonable application of *Strickland*, is more closely on point.**[22]** In *Visciotti*, the Supreme Court considered a state court's rejection of a defendant's *Strickland* claim. 537 U.S. at 26. The state court had weighed the mitigating evidence, including the defendant's brain damage, difficult family background, and possible seizure disorder, against the aggravating factors, including the circumstances of the crime (the cold-blooded killing of two victims during a robbery) and his criminal history of knifing a man and stabbing a pregnant woman in bed "trying to protect her unborn baby," and concluded that the defendant had suffered no prejudice. *See id.* at 25–26. After the defendant filed a habeas petition, the district court granted relief, and we affirmed. We reasoned that counsel's deficient performance was prejudicial, because the "aggravating factors were not overwhelming." *Id.* at 21–22, 25 (quoting *Visciotti v.*

---

present mitigating evidence, including evidence of his rape in prison. *Doe* is not pertinent to our analysis here because it is a pre-AEDPA case that does not examine whether the state court's conclusion was unreasonable. *See id.* at 428, 446 n.31. Nor is *Doe* clearly established law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

**[22]** Although *Visciotti* was decided after the California Supreme Court's decision in this case, we give it careful consideration because it addresses the AEDPA question whether a state court's adjudication of an ineffective assistance of counsel claim was an unreasonable application of *Strickland*. *See supra* at 39–40; *see also* Dissent at 116–117 & n.9 (acknowledging that Supreme Court opinions analyzing AEDPA are relevant to a circuit court's AEDPA analysis, regardless whether those opinions were decided before or after the last reasoned opinion of the state court). The dissent highlights that *Visciotti* was "decided *after* the California Supreme Court's decision in this case," Dissent at 118, but given the dissent's acknowledgment that our consideration of a Supreme Court opinion analyzing AEDPA is proper, the meaning of this emphasis is unclear.

*Woodford*, 288 F.3d 1097, 1118 (9th Cir. 2002)). The Supreme Court reversed. It explained that "under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Id.* at 27 (internal quotation marks omitted). Rather, "[t]he federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable. It is not that here." *Id.* In sum, the Court held that "[w]hether or not we would reach the same conclusion as the California Supreme Court, we think at the very least that the state court's contrary assessment was not 'unreasonable.'" *Id.* (quoting *Bell*, 535 U.S. at 701) (internal quotation marks omitted).

Here, as in *Visciotti*, the state court reweighed Andrews's mitigating evidence against the brutal circumstances of the crime and Andrews's prior criminal history, and determined there was no reasonable probability that the sentencer would determine that "the balance of aggravating and mitigating factors did not warrant imposition of the death penalty." *Id*. at 22 (internal quotation marks omitted). This decision was not objectively unreasonable, and therefore we are bound to conclude that "[w]hether or not we would reach the same conclusion," we cannot say the California Supreme Court's conclusion was an unreasonable application of *Strickland*. *See id.* at 27.**[23]**

---

**[23]** The fact that our decision in this case was originally unanimous, *see Andrews v. Davis*, 798 F.3d 759 (9th Cir. 2015), and there have been no relevant factual or legal developments since that time, underscores our conclusion that fairminded jurists could hold that the state court's determination was not objectively unreasonable.

The dissent purports to recognize that "our deference to state court decisions is at its zenith on federal habeas review," Dissent at 96, but fails to apply this standard. Here, the California Supreme Court determined that there was not a reasonable probability that the outcome would have been different had the evidence adduced at the reference hearing (along with the rebuttal evidence) been presented to the jury. *In re Andrews*, 52 P.3d at 671, 675–76. The dissent does not—and cannot—explain why the court's conclusion is an objectively unreasonable application of then-existing Supreme Court precedent. The dissent points to *Williams*, Dissent at 114–116, but makes no effort to explain the flaw in the California Supreme Court's "principled distinction" of this case. *Murdoch*, 609 F.3d at 991; *see supra* at 58–59. Nor does the dissent meaningfully engage with the facts of *Porter* or dispute the numerous distinctions addressed above. *See supra* at 59–62; Dissent at 116–118.[24]

The dissent fails to address the pertinent question, which "'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*,

---

[24] The dissent's reliance on *Wiggins* and *Rompilla* to support its *Strickland* analysis, *see* Dissent at 112–113, 117, is mistaken, because these cases were decided after the California Supreme Court ruled. While we may always consider the Supreme Court's reasoning in applying AEDPA, both *Wiggins* and *Rompilla* examined the prejudice prong of *Strickland* de novo. *Wiggins*, 539 U.S. at 534; *Rompilla*, 545 U.S. at 390. Therefore, these cases do not provide any guidance on the issue before us, whether a state court's determination that counsel's deficiency was not prejudicial was an unreasonable application of clearly established Supreme Court precedent.

550 U.S. 465, 473 (2007)).  Instead, the dissent concludes that the California Supreme Court unreasonably applied *Strickland* based on the dissent's own view that "at least one juror" would be inclined to "spare Andrews's life" if evidence of the abuse at Mt. Meigs had been presented. Dissent at 92; *see id.* at 92, 111, 120.  This approach would be wrong even under de novo review.  The dissent's limited focus on a single piece of evidence fails to take into account the totality of the mitigating and aggravating evidence in the record.  *See Strickland*, 466 U.S. at 695.  In this context, the dissent's supposition that one juror would have been moved amounts to little more than a mere possibility of a different outcome, where the Supreme Court has made clear that "[t]he likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

The dissent's errors are even more glaring on AEDPA review.  The Court has told us frequently and emphatically that "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous."  *Lockyer*, 538 U.S. at 75 (internal quotation marks and citations omitted).    Rather, the state court's decision "must be objectively unreasonable," *id.*, considering "the totality of the evidence before the judge or jury," *Strickland*, 466 U.S. at 695.  Here, rather than apply AEDPA deference, the dissent steps into the shoes of the dissenting justice of the California Supreme Court in this case, *see* Dissent at 98, 100–104, 107–108, 116, and applies *Strickland* de novo.  Indeed, the dissent even makes its own factual findings. *See* Dissent at 107, 115 (discounting the substantial rebuttal evidence that would have been presented at sentencing on the ground that the prosecutor from Andrews's trial would not have

introduced rebuttal witnesses had the defense presented evidence of Andrews's prison conditions, a factual conclusion contrary to the determinations of the referee and the California Supreme Court, *see In re Andrews*, 52 P.3d at 666). Such review is erroneous under AEDPA. In taking this de novo approach, the dissent has failed to grapple with "the only question that matters under § 2254(d)(1)," *Lockyer*, 538 U.S. at 71, whether the state court's application of the clearly established Supreme Court precedent was objectively unreasonable.

Because the state court's rejection of Andrews's penalty phase ineffective assistance of counsel claim was not contrary to or an unreasonable application of Supreme Court precedent, we may not grant relief on this claim. § 2254(d)(1). We therefore reverse the district court's contrary conclusion.

## D

Because we decide Andrews's claim on prejudice grounds, we need not address the parties' arguments regarding whether counsel's performance was deficient at the penalty phase. *Strickland*, 466 U.S. at 697.[25] Suffice it to say, the dissent fails to conduct an AEDPA analysis of the California Supreme Court's determination that Andrews's attorney was not deficient under *Strickland*. Instead, as we have previously noted, *supra* at 25 n.3, 26–27 n.4, 28 n.5, 28–29 n.6, 30 n.7, 30–31 n.8, 33–34 n.9, the dissent engages in de novo review of both the facts and the law at issue, *see*

---

[25] We also need not consider the additional aggravating evidence put forth by the state, which Andrews disputes, and therefore deny the state's motion for judicial notice of these additional materials.

Dissent at 96–111, and relies on cases that were not clearly established at the time of the California Supreme Court's ruling, *see, e.g.*, Dissent at 100, 106 (relying on the deficiency analysis of *Porter*, which was decided years after the California Supreme Court's opinion in this case and reviewed the issue of deficiency de novo). And in reaching its de novo conclusion that "any competent attorney would have presented" the Mt. Meigs evidence, Dissent at 109, the dissent ignores "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard," *Mirzayance*, 556 U.S. at 123. Accordingly, the dissent fails to raise any serious questions regarding the California Supreme Court's analysis of *Strickland*'s deficiency prong.

## III

Having addressed the state's cross-appeal, we now turn to Andrews's appeal of the district court's dismissal of his sole certified claim (Claim 25) that California's use of its lethal injection protocol to execute him would violate his Eighth Amendment rights. According to the district court, the California lethal injection protocol mirrored the Kentucky lethal injection protocol upheld by the Supreme Court against an Eighth Amendment challenge in *Baze v. Rees*, 553 U.S. 35 (2008). The court reasoned that in light of *Baze*'s ruling, it would be impossible for Andrews to succeed on his challenge to California's lethal injection protocol, and therefore rejected this claim.

At the time the district court ruled in July 2009, California did not have a lethal injection protocol in place. As explained in *Sims v. Department of Corrections*, the California Department of Corrections and Rehabilitation (CDCR) has

the responsibility for developing a procedure for executions by lethal injection. 216 Cal. App. 4th 1059, 1064 (2013). In December 2006, a federal district court ruled that CDCR's procedure violated the Eighth Amendment prohibition against cruel and unusual punishment. *Id.* (citing *Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal. 2006)). Although the CDCR substantially revised its protocol in 2007, a state trial court invalidated the revised procedure on the ground that it violated the state's administrative procedure act. *Id.*[26] Because no new protocol was in place at the time the district court ruled, the claim was unripe, and the district court erred in entertaining it. *See Payton v. Cullen*, 658 F.3d 890, 893

---

[26] After losing its appeal, CDCR promulgated a new procedure, which took effect on August 29, 2010. *Sims*, 216 Cal. App. 4th at 1064–65. In response to a new legal challenge, a trial court again invalidated the CDCR lethal injection procedure for failure to comply with the state administrative procedure act and permanently enjoined the CDCR from administering executions by lethal injection until it promulgated new regulations. *Id.* at 1066–67. This injunction was upheld on appeal. *Id.* at 1083–84. The CDCR proposed a new single-drug lethal injection protocol in November 2015. Pursuant to California's Administrative Procedure Act (APA), the CDCR held a mandatory public comment period, responded to each substantive comment, made any necessary changes, and resubmitted the proposed protocol for additional public comment until November 7, 2016. *See* Cal. Gov. Code §§ 11346–48. On December 28, 2016, the California Office of Administrative Law (OAL) rejected the proposed lethal injunction protocol and stated that revisions may be resubmitted within 120 days. In 2016, California voters approved the Death Penalty Reform and Savings Act of 2016 (Proposition 66), which amended state statute to provide that the state APA does not apply to lethal injection protocols. The California Supreme Court stayed "implementation of all provisions of Proposition 66" pending the resolution of litigation challenging its implementation. *Briggs v. Brown*, 387 P.3d 1254, 1255 (Cal. 2017).

(9th Cir. 2011).[27] Andrews may renew his challenge when California has finally approved its protocol. *Id.*

IV

Andrews also raises several uncertified claims based on the following legal theories: (1) unconstitutional delay between sentencing and execution under *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., statement respecting denial of certiorari); (2) ineffective assistance of trial counsel under *Strickland*; (3) failure to disclose material exculpatory evidence and false testimony under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264, 269 (1959); and (4) destruction of evidence in violation of due process under *California v. Trombetta*, 467 U.S. 479 (1984), and its progeny. He also raises uncertified claims based on cumulative error and factual innocence.

We first turn to the question whether Andrews must obtain a COA for these claims under 28 U.S.C. § 2253(c).[28]

---

[27] In light of this holding, we need not reach Andrews's claims that the district court erred in denying him an evidentiary hearing on Claim 25 or in declining to stay this claim to allow him to rely on evidence presented in *Morales*.

[28] Section 2253(c) states:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

Our analysis of this question is governed by *Jennings v. Stephens*, which considered whether a habeas petitioner who obtained relief in the district court could defend this judgment on alternate grounds without taking a cross-appeal and obtaining a COA. 135 S. Ct. 793, 798 (2015). *Jennings* held that a habeas petitioner in such circumstances need not take a cross-appeal so long as the petitioner did not attempt to defend the district court's judgment on a theory that seeks "to enlarge his rights or lessen the State's under the District Court's judgment granting habeas relief." *Id.* at 798, 801–02.[29] Further, because "§ 2253(c) applies only when 'an appeal' is 'taken to the court of appeals,'" *id*. at 802 (quoting § 2253(c)), a petitioner who does not have to take a cross-appeal does not need a COA, *id.* Applying this rule, *Jennings* noted that the district court's judgment granting the petitioner relief at the penalty phase of his trial entitled him "to release, resentencing, or commutation, at the State's option." *Id.* at 799. Accordingly, "[a]ny potential claim that would have entitled [the petitioner] to a new sentencing proceeding could

---

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

[29] *Jennings* was nonetheless careful to note that a petitioner defending his judgment on appeal would be "confined to those alternative grounds present *in the record*: he may not simply argue *any* alternative basis, regardless of its origin." *Jennings*, 135 S. Ct. at 800.

have been advanced to 'urge . . . support' of the judgment," *id.* at 800 (last alteration in original) (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924)). Neither a cross-appeal nor a COA would be required. *Id.* at 800–02. By contrast, "[a] habeas applicant who has won resentencing would be required to take a cross-appeal in order to raise a rejected claim that would result in a new trial." *Id.* at 800. And "if a habeas applicant has won retrial below, a claim that his conduct was constitutionally beyond the power of the State to punish would require cross-appeal." *Id.* In both such cases, a COA would also have been required. *See id.* at 802.

Here, Andrews won relief at the district court based on his theory of ineffective assistance of counsel during the penalty phase of his trial. The district court ordered that "the State of California shall, within 120 days from the entry of this Judgment, either grant Petitioner a new penalty phase trial, or vacate the death sentence and resentence the Petitioner in accordance with California law and the United States Constitution." Accordingly, Andrews's rights under this judgment were for a new penalty phase trial or resentencing within a fixed time, and Andrews may urge any potential claim present in the record that would entitle him to a new penalty phase trial or resentencing without taking a cross-appeal or obtaining a COA. *See id.* at 800–02.

But none of Andrews's uncertified claims support the district court's judgment. Five of his claims seek a new guilt phase trial (his *Strickland*, *Brady*/*Napue*, *Trombetta*, and cumulative error claims, and a factual innocence claim).[30] As

---

[30] While the Supreme Court has not ruled on the question whether a free-standing claim of factual innocence is cognizable in habeas, it has suggested that success on such a claim (if cognizable) would entitle a

explained in *Jennings*, because Andrews won resentencing, he must take a cross-appeal and obtain a COA to raise a claim that results in a new trial. *Id*. His *Lackey* claim seeks a ruling that the state cannot constitutionally impose the death penalty on him. Because the district court's order gave the state the right to seek the death penalty at a new penalty phase trial, Andrews's *Lackey* and factual innocence claims seek to "lessen the State's [rights] under the District Court's judgment granting habeas relief." *Id.* at 798. Under *Jennings*, Andrews must bring a cross-appeal and obtain a COA to raise these claims as well.

We lack jurisdiction to consider uncertified claims unless we determine that Andrews "has made a substantial showing of the denial of a constitutional right" and grant a COA. 28 U.S.C. § 2253(c)(2); *see also* Ninth Circuit Rule 22-1(e) ("Uncertified issues raised and designated [in a petitioner's opening brief] will be construed as a motion to expand the COA . . . ."). Habeas petitioners must make a "showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). Because the statute is jurisdictional,"[t]his threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). As the Supreme Court directed in *Miller-El*, rather than "[d]eciding the substance of an appeal," 537 U.S. at 342, we

---

petitioner to a new guilt phase trial. *Herrera v. Collins*, 506 U.S. 390, 403, 405, 417 (1993).

"look to the District Court's application of AEDPA to petitioner's constitutional claims," *id.* at 336, in light of a "fair interpretation of the record," *id.* at 345, and ask whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *id.* at 338. While the Court has not specified "what procedures may be appropriate in every case," any procedures "employed at the COA stage should be consonant with the limited nature of the inquiry." *Buck*, 137 S. Ct. at 774.

A

We first consider Andrews's claim that his execution would violate the Eighth Amendment due to the long delay between his sentence and execution. Andrews did not raise this claim in his opening brief on appeal, but moved to file a supplemental brief raising this claim after a district court issued a decision holding that under *Furman v. Georgia*, 408 U.S. 238 (1972) and *Gregg v. Georgia*, 428 U.S. 153 (1976), California's death penalty system violated the Eighth Amendment because its "dysfunctional administration" resulted in "inordinate and unpredictable" periods of delay before execution, such that executions do not serve a retributive or deterrent purpose and will be arbitrary. *Jones v. Chappell*, 31 F. Supp. 3d 1050, 1053, 1061–62, 1069 (C.D. Cal. 2014), *rev'd sub nom. Jones v. Davis*, 806 F.3d 538 (9th Cir. 2015). We granted his motion, and ordered the state to respond.

In his brief, Andrews stated that he raised this claim to the district court as Claim 26. In Claim 26, Andrews had argued that executing him after 22 years on death row would be cruel and unusual punishment in violation of the Eighth Amendment and would serve no retributive or deterrent

penological purpose. Claim 26 also asserted that Andrews did not cause any unnecessary delays, but merely sought to vindicate his constitutional rights in a system that produced delays. Andrews exhausted this claim by raising it to the California Supreme Court, which summarily denied it.

The district court rejected this claim on the merits on the ground that there has been no demonstration of "any support in the American constitutional tradition or in [Supreme Court] precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed," a quote from *Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in a denial of certiorari), relied on by two Ninth Circuit cases, *Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010), and *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006), as evidence that no Supreme Court precedent supports a claim of unconstitutional delay.

On appeal, Andrews argues that the delay in carrying out the death sentence makes California's death penalty unconstitutional both on its face and as applied to him. After discussing in detail *Jones*'s reasoning and conclusion that the California death penalty system is unconstitutional, Andrews argues that no fairminded jurist could disagree with such a conclusion in his case, because he has been continuously confined under sentence of death for more than 30 years, and the delays are caused by factors outside his control. Andrews also points to separate statements by individual Supreme Court justices questioning the constitutionality of the inherent delay in capital cases. *See, e.g.*, *Muhammad v. Florida*, 134 S. Ct. 894 (2014) (Breyer, J., dissenting from denial of certiorari); *Johnson v. Bredesen*, 558 U.S. 1067 (2009)

(Stevens, J., joined by Breyer, J., statement respecting denial of certiorari); *Lackey*, 514 U.S. 1045 (Stevens, J., statement respecting denial of certiorari) (stating that a prisoner's claim that his 17 years on death row violates the Eighth Amendment's prohibition against cruel and unusual punishment was "not without foundation," and encouraging state and federal courts to consider the issue).

Before we can address this claim, we must consider several procedural hurdles. As a threshold matter, Andrews did not raise this claim in his opening brief on appeal. While we generally deem a petitioner to have waived any issue not raised in an opening brief, *see United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992), we recognize exceptions to this general rule. Such an exception is applicable here: the state has fully briefed the issue and would suffer no prejudice. *See id*. Therefore, we conclude we may address this issue.

Next, the state argues that Andrews's claim was not fairly presented to the California Supreme Court or the district court, and so is both unexhausted and waived. "A federal court may not grant habeas relief to a state prisoner unless he has properly exhausted his remedies in state court." *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) (en banc) (quoting *Peterson v. Lampert*, 319 F.3d 1153, 1155 (9th Cir. 2003) (en banc)). Exhaustion of constitutional claims requires that the claims be "fairly presented" in state court, allowing the state courts an "opportunity to act on them." *Id.* at 1318 (alterations and internal quotation marks omitted). To be fairly presented in state court, a claim must include: (1) "a statement of the facts that entitle the petitioner to relief," *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996), and (2) citations "to either a federal or state case involving the legal standard for a federal constitutional violation,"

*Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005). "A claim has not been fairly presented in state court if new factual allegations either fundamentally alter the legal claim already considered by the state courts, or place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it." *Dickens*, 740 F.3d at 1318 (citations and internal quotation marks omitted). Two claims are distinct and must be separately exhausted if the claims are based on the same facts, but are supported by distinct constitutional theories. *See Gray*, 518 U.S. at 163–65. "[G]eneral appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion." *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). But when claims are "sufficiently related" or "intertwined" so that raising one clearly implies the other, exhausting one claim will also exhaust the related claim, so long as the failure to explicitly raise the related claim was not a "strategic choice." *Lounsbury v. Thompson*, 374 F.3d 785, 788 (9th Cir. 2004) (internal quotation marks omitted) (holding that exhaustion of a procedural challenge to petitioner's competency determination exhausted a substantive challenge to the same determination, though the two challenges relied on two distinct Fifth Amendment theories); *see also Wooten v. Kirkland*, 540 F.3d 1019, 1025 (9th Cir. 2008).

The state asserts that there is a distinction between the sort of Eighth Amendment claim that Andrews raised to the California Supreme Court and in district court (sometimes referred to as a *Lackey* claim), and the Eighth Amendment claim based on *Jones* he is raising here, such that the state courts lacked an opportunity to consider it. Specifically, the state argues that a *Lackey* claim is an individual challenge, based on the theory that executing a prisoner who has spent

many years on death row violates the prohibition on cruel and unusual punishment of that prisoner, while *Jones* was based on the theory that the California system itself creates the constitutional infirmity, because inordinate delay makes the system arbitrary and unable to serve a deterrent or retributive purpose, in violation of the Eighth Amendment.

We disagree that Andrews is raising a systemic challenge to California's administration of its death penalty system, which would be a new and unexhausted claim. Rather, Andrews's claim before the state court, the district court, and on appeal here is essentially the same constitutional claim: that his right to be free from cruel and unusual punishment under the Eighth Amendment is violated by his lengthy incarceration while under a sentence of death. Andrews has not introduced any new facts or evidence since he raised this argument to the state court. Andrews's supplemental brief points to *Jones*'s conclusion that there are systemic delays in imposing the death penalty throughout the California system, but uses this conclusion to support his *Lackey* claim that "inherent delay in capital cases" renders executions unconstitutional. Accordingly, Andrews's references to *Jones* do not "fundamentally alter the legal claim already considered by the state courts." *Dickens*, 740 F.3d at 1318 (internal quotation marks omitted). We therefore conclude that Andrews's uncertified claim, as briefed on appeal, is sufficiently related and intertwined with Claim 26 such that Andrews's exhaustion of Claim 26 likewise exhausted his current challenge. *See Lounsbury*, 374 F.3d at 788. Moreover, Andrews raised this same claim to the district court. Accordingly, Andrews exhausted this delay claim and did not waive it.

We now consider Andrews's motion for a COA for this claim.  The district court denied Claim 26 because the state court's rejection of this claim was not an unreasonable application of Supreme Court precedent.  No reasonable jurist would find the district court's ruling debatable or wrong.  *See Slack*, 529 U.S. at 484.  As we have previously stated in the AEDPA context, no clearly established Supreme Court precedent holds that inordinate delay in the execution of a capital defendant constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *Allen*, 435 F.3d at 958–60.  Andrews argues that the state court's rejection of his delay claim is contrary to *Furman*, 408 U.S. at 311–12 (White, J., concurring), and *Gregg*, 428 U.S. at 188 (plurality opinion).   But these cases articulate a general Eighth Amendment standard that the death penalty is unconstitutional if imposed arbitrarily, or if the penalty itself does not serve the penological purposes of deterrence and retribution.  These principles do not "squarely address[]" the specific issue raised by Andrews's delay claim, and would require a significant extension of the rationale of *Furman* and *Gregg* to apply in this particular context.  *See Van Patten*, 552 U.S. at 125–26.

We reached a similar determination in *Jones v. Davis*, where we held that neither *Furman* nor *Gregg* established the rule that the Eighth Amendment barred delays in resolving post-conviction proceedings.  *See* 806 F.3d at 551.  In light of the Supreme Court's rule that "federal courts may not consider novel constitutional theories on habeas review," *id.* at 541 (citing *Teague v. Lane*, 489 U.S. 288 (1989)), we concluded that neither a *Lackey* claim nor a systemic challenge to California's death penalty system was cognizable in federal habeas proceedings.  *Id.* at 548, 552.  Because such claims are barred from habeas consideration

under *Teague*, *see id.* at 548, 552, they are not clearly established rules under 28 U.S.C. § 2254(d)(1). *Schardt v. Payne*, 414 F.3d 1025, 1037 (9th Cir. 2005). Therefore, the state court's rejection of Andrews's delay claim was not an unreasonable application of *Furman* or *Gregg*, and reasonable jurists would not dispute the district court's conclusion to that effect. *See Woodall*, 134 S. Ct. at 1706–07. Therefore, the state court's rejection of Andrews's delay claim was not an unreasonable application of *Furman* or *Gregg*, and reasonable jurists would not dispute the district court's conclusion to that effect. *See Woodall*, 134 S. Ct. at 1706–07.

Because Andrews has not made a "substantial showing" that his Eighth Amendment rights were violated, *see* 28 U.S.C. § 2253(c)(2), we deny a COA for this claim.

B

We next turn to Andrews's four uncertified claims alleging that trial counsel were ineffective under *Strickland* for failing to investigate and present four categories of evidence.

The first claim relates to the police's investigation of suspects before Sanders was arrested and agreed to testify pursuant to a plea agreement. During the investigation, police officers took statements from at least nine witnesses and informally interviewed many others who provided information about activities in and around Wheeler's apartment in the days leading up to the murders. According to these statements, Wheeler's drug customers frequented his apartment, disturbances were a regular occurrence, and shootings had occurred in the apartment. The police did not find any corroborating physical or testimonial evidence

suggesting that any of these drug customers was the killer. When investigating Wheeler's apartment, the police found fingerprints of individuals who had been seen in the apartment on the evening the murders occurred, but nothing linking them to the crime. The police arrested one drug dealer who worked with Wheeler, but ultimately released him. When interrogated, this drug dealer denied murdering Wheeler, but told the police that a Mexican Mafia member had told him that the Mexican Mafia had murdered Wheeler. He did not provide any corroborating evidence to support this story.

Relying on this evidence, Andrews claims that his trial counsel were ineffective for failing to investigate and present evidence that third parties, such as Wheeler's customers and fellow dealers, had the motive and opportunity to commit the murders due to their drug-related dealings with Wheeler. The state court summarily rejected this claim when it denied Andrews's second state habeas petition. The district court denied relief on this claim.

We conclude that reasonable jurists would not find debatable or wrong the district court's conclusion that this claim fails under *Strickland* and AEDPA. *See Slack*, 529 U.S. at 484. The evidence adduced at trial was overwhelming: Sanders, an eyewitness, testified to the events of the murders, Brooks testified regarding Andrews's confession, and the evidence established that Andrews's palm prints were found on either side of Brandon's body. *In re Andrews*, 52 P.3d at 658. Accordingly, reasonable jurists would not debate the reasonableness of the state court's conclusion that counsel's failure to further investigate these suspects did not prejudice Andrews's defense. *See Strickland*, 466 U.S. at 694.

Second, Andrews argues that counsel were ineffective for failing to investigate or present evidence that semen found on Brandon's body could not have come from Andrews. The district court's conclusion that the state court did not unreasonably apply *Strickland* in rejecting this claim is not debatable, because the state court could reasonably conclude that counsel's failure to introduce such evidence was not prejudicial. The record shows only that slides containing semen found on Brandon's body contain biological markers that some people secrete and others do not. Andrews does not secrete these markers, but the record is silent as to whether Brandon was a secretor. Andrews offers statistical evidence suggesting that Brandon was probably not a secretor, but the evidence is not conclusive. Indeed, even other experts testifying for Andrews noted that what minimal evidence they obtained was subject to challenge. In light of the eyewitness testimony about Andrews's involvement in the murders, and his palm prints next to Brandon's body, reasonable jurists would not dispute that the state court reasonably concluded that any deficiency by defense counsel was not prejudicial.

Next, Andrews raises two claims relating to the police investigation of fingerprint evidence found at Wheeler's apartment. As explained by the state court on direct appeal, two of the police's fingerprint experts, Howard Sanshuck and Donald Keir, testified at trial that they compared 50 fingerprints found in Wheeler's apartment with Andrews's fingerprints and palm prints. *People v. Andrews*, 776 P.2d at 289. The two experts concluded that left and right palm prints on the kitchen floor on either side of Brandon's body belonged to Andrews. *Id*. Sanshuck's supervisor, Jimmy Cassel, had previously reviewed the prints and initially labeled them as belonging to Wheeler. *Id*. Sanshuck

discovered the error shortly before Andrews's first trial. At the second trial, Cassel stated that the original misidentification was due to his efforts to process the crime scene information too quickly, and testified that there was no similarity between the palm prints found on the kitchen floor and Wheeler's prints. *Id*. The three experts, Sanshuck, Keir, and Cassel, all testified at the second trial that Andrews's palm prints matched the palm prints found on either side of Brandon's body. *Id*. Andrews has never adduced any evidence to rebut this.

On appeal, Andrews claims that his counsel were deficient in failing to investigate two different lines of defense. First, Andrews claims that counsel performed deficiently by failing to present evidence that Andrews's fingerprints could have been left in Wheeler's apartment due to his prior visits. Second, Andrews claims that counsel should have uncovered and used the police's original misidentification of his palm prints. Andrews points to other reports in the record which he claims shows that Keir and a third analyst, William Leo, also misidentified his fingerprints. The district court rejected this claim. In light of the unrebutted evidence that the palm prints found on either side of Brandon's body were Andrews's prints, no reasonable jurist would dispute the district court's determination that the state court could reasonably have concluded that counsel's handling of the fingerprint evidence did not prejudice Andrews's defense. *See Strickland*, 466 U.S. at 694.

Finally, Andrews claims that counsel were ineffective for failing to investigate or present evidence regarding his alibi the night of the murder. The record shows that Andrews gave a defense investigator the names of two alibi witnesses and information on how to locate them, but Andrews did not

provide any affidavits from these witnesses to the state court, or any further information about the nature of their testimony. The state court and district court rejected this claim. In light of the detailed testimony from Sanders and Brooks, the evidence of Andrews's palm prints on either side of Brandon's body, and the lack of any evidence regarding the alibi witnesses, no reasonable jurist would dispute that the state court reasonably applied *Strickland* in concluding that counsel's failure to further investigate these witnesses was not prejudicial.

Andrews relies on *United States v. Valenzuela-Bernal* for the proposition that he could establish his ineffective assistance of counsel claim without showing how his alibi witnesses would have testified, because he needed to show only that their testimony would be material and favorable to his defense. 458 U.S. 858, 867 (1982). Therefore, Andrews claims, the state court erred in rejecting his *Strickland* claim. The district court rejected this argument, and we agree. *Valenzuela-Bernal* held that when the government deports aliens who could aid a criminal defendant in his defense, there is no violation of the criminal defendant's right to compulsory process under the Sixth Amendment unless the defendant "make[s] some plausible showing of how [the alibi witness's] testimony would have been both material and favorable to his defense." *Id.* This ruling does not "squarely address[] the issue," *Van Patten*, 552 U.S. at 125–26, or "establish a legal principle that clearly extends" to the question whether Andrews's counsel's failure to pursue the alibi witnesses was ineffective assistance of counsel, *see Moses*, 555 F.3d at 754 (quoting *Van Patten*, 552 U.S. at 123) (alterations and internal quotation marks omitted). Accordingly, the state court's rejection of Andrews's claim

was not an unreasonable application of *Valenzuela-Bernal.* *See Woodall*, 134 S. Ct. at 1706–07.

In sum, the state court did not unreasonably apply *Strickland* in concluding that Andrews did not create a "substantial, not just conceivable" likelihood of a different result, or that "any real possibility of [Andrews's] being acquitted was eclipsed by the remaining evidence pointing to guilt," *Richter*, 562 U.S. at 112–13; *see also Strickland*, 466 U.S. at 695–96, and the district court's determination to this effect was not debatable. Accordingly, Andrews has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and we decline to issue a COA.

C

Andrews argues that the state court erred in rejecting two claims that his rights under *Brady* were violated. *Brady* requires the state to disclose "evidence that is both favorable to the accused and material either to guilt or to punishment." *U.S. v. Bagley*, 473 U.S. 667, 674 (1985) (internal quotation marks omitted). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. Thus, to establish a *Brady* violation, a defendant must prove: (1) "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) the evidence was "suppressed . . . either willfully or inadvertently," and (3) prejudice resulted, meaning there is a reasonable probability that disclosing the evidence to the defense would have changed the result. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Bagley*, 473 U.S. at 682.

Andrews claims the state suppressed two pieces of evidence. First, he contends that the prosecution failed to disclose a case file maintained by the Los Angeles Police Department, termed a "murder book," which contained material evidence including the third party culpability and fingerprint evidence also advanced in support of his ineffective assistance of counsel claims. The state court could reasonably have rejected this claim because the state had provided counsel with a chronology of the police investigation referring to much of the allegedly suppressed murder book evidence. The district court held the state court's conclusion was not an unreasonable application of *Brady*. No reasonable jurist could disagree with this conclusion, because the state court could reasonably have concluded that the evidence was not suppressed under *Brady*. *See United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) (holding the government does not suppress evidence for purposes of *Brady* where "the means of obtaining the exculpatory evidence [was] provided to the defense"). Moreover, the state court could have reasonably concluded that the result of the proceeding would not have been different even if the evidence had been disclosed to the defense. *See Strickler*, 527 U.S. at 280.

For the same reason, no reasonable jurist could disagree with the district court's rejection of Andrews's second *Brady* claim, that the prosecution withheld the fact that Brooks was subject to charges of welfare fraud. The state court could have reasonably concluded that defense counsel had sufficient information to discover that charges had been filed, because defense counsel knew that Brooks was being investigated for welfare fraud, and questioned her about it at trial, outside the presence of the jury. *See Dupuy*, 760 F.2d at 1501 n.5.

Andrews also raises claims under *Napue*, which provides that the state may not "knowingly use false evidence, including false testimony" or "allow[] it to go uncorrected when it appears." 360 U.S. at 269. According to Andrews, the state knowingly adduced false testimony from two fingerprint experts, Keir and Sanshuck. First, Andrews notes that a report in the record, dated August 4, 1980, states that Keir reviewed "fingers" from a suspect named "Walters" (the alias being used by Andrews at the time) and concludes that the prints were "not made." This means, Andrews argues, that Keir lied in identifying the palm prints found by Brandon's body as being from Andrews, and also lied when he testified that he first examined Andrews's palm prints in November 1983. The state asserts Keir did not testify falsely, because the report references fingerprints, while Keir testified regarding palm prints. Second, Andrews argues that Sanshuck's testimony that police policy did not require photographs to be taken of prints on the surface from which they were lifted was false, because it contradicted a Los Angeles Police Department Homicide Manual, dated 1981.[31] The state argues that no false information was knowingly presented, *see id.*, because the homicide manual used permissive, not mandatory, language, and because the manual's statement did not reflect the police department's

---

[31] The Los Angeles Police Department Homicide Manual states in pertinent part:

Note: (A) Photographing Prints

Prints found at the scene of a homicide should be photographed. The procedure is recommended because it is much easier to introduce print evidence into court if the print has been photographed, as parts of the object which carried the print may show in the picture.

actual practice, which was the subject of Sanshuck's testimony. The district court rejected Andrews's *Napue* claims, and no reasonable jurist could disagree that the state court could reject these claims based on the reasonable view of the facts offered by the state. *See Maddox*, 366 F.3d at 999–1000 (holding that under AEDPA, state court fact finding must be not merely wrong, but "actually unreasonable" and without support in the record to warrant habeas relief).

## D

Andrews makes three claims based on the fact that between 1993 and 1995, all biological evidence in this case was destroyed, except for 50 fingerprint cards, one vaginal slide, one oral slide, and one anal slide. His petition to the California Supreme Court claimed that the destruction of the evidence violated his due process rights under *Trombetta* and *Arizona v. Youngblood*, a case that held that the government's "failure to preserve potentially useful evidence" before trial does not violate a defendant's due process rights unless the criminal defendant can show that the government acted in bad faith. 488 U.S. 51, 58 (1988). As Andrews acknowledges, the Supreme Court has since held that cases assessing pre-conviction access to evidence, which would include *Trombetta* and *Youngblood*, do not apply to cases where a defendant is denied access to evidence after being convicted. *See Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 61–62, 68–69, 74 (2009); *see also Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (observing that "the Supreme Court has not clearly established that post-conviction destruction [of evidence] is a due process violation"). Therefore, the California Supreme Court did not unreasonably apply *Trombetta* or *Youngblood*.

Andrews relies on *Osborne* to make a second claim, that the destruction of evidence violated his due process and Eighth Amendment rights. We do not consider whether the state court's decision was contrary to or an unreasonable application of *Osborne*, because it was decided after the California Supreme Court ruled, and thus is not clearly established precedent for purposes of § 2254(d)(1). This theory was not briefed to the district court, as the case was decided between completion of briefing and the court's decision. Andrews points to no clearly established precedent in existence at the time the state court ruled that applies this principle, and therefore the district court's rejection of this claim was not debatable among fair minded jurists.

Andrews's third claim is that the destruction of evidence denied him access to the courts to vindicate an underlying claim of factual innocence. However, as the district court recognized in rejecting this claim, he cites no Supreme Court precedent clearly establishing that destruction of evidence after a defendant is convicted violates a right of access to the courts. *Christopher v. Harbury*, on which Andrews relies, is not on point: it held that a plaintiff's claim that government officials misled her in connection with her husband's disappearance did not state a constitutional denial of access claim upon which relief could be granted. 536 U.S. 403, 407, 415, 418–19 (2002). Accordingly, no reasonable jurist could dispute that the district court correctly denied this claim.

E

In light of the above, we conclude that no reasonable jurist would disagree with the district court in rejecting Andrews's cumulative error claim. "[T]he fundamental question in determining whether the combined effect of trial

errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citation omitted) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) and *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). We agree with the district court that the California Supreme Court reasonably determined that any errors, in the aggregate, did not have such a substantial or injurious effect on the verdict. The cumulative result of the disputable errors identified by Andrews would not have made his defense significantly more persuasive, since his defense focused on attacking the credibility of Sanders and Brooks and challenging the fingerprint and palm print evidence. Reasonable jurists would not dispute the district court's conclusion, so no COA is warranted.

Nor would any reasonable jurist disagree with the district court's conclusion that the state court did not err in rejecting Andrews's factual innocence claim. The state court could have reasonably concluded that Andrews's introduction of slides showing that biological markers found in the semen on Brandon's body had not been secreted by Andrews and may not have been secreted by Brandon, described above, was insufficient to "go beyond demonstrating doubt about his guilt [to] affirmatively prove that he is probably innocent." *See Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc) (observing that the standard for establishing a freestanding claim of actual innocence is "'extraordinarily high,' and that the showing [for a successful claim] would have to be 'truly persuasive.'" (quoting *Herrera*, 506 U.S. at 417) (O'Connor, J., concurring)). This claim does not merit a COA.

In sum, because the district court's conclusions, under AEDPA review, are not debatable among reasonable jurists, Andrews fails to make the "substantial showing of the denial of a constitutional right" required for a COA to issue, and we deny his request for one as to each of his uncertified claims.

V

Andrews contends that the district court erred in denying his motion for an evidentiary hearing on 16 claims (Claims 1–8, 15, 19–23, 25, and 32), which include all but one of the claims on appeal here.[32] We review a district court's denial of an evidentiary hearing for an abuse of discretion, *Sully v. Ayers*, 725 F.3d 1057, 1067 (9th Cir. 2013), and "may affirm the district court's decision on any ground supported by the record, even if it differs from the district court's rationale," *id*. (internal quotation marks omitted). In *Pinholster*, the Supreme Court stated that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. "[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief." *Sully*, 725 F.3d at 1075; *see Pinholster*, 563 U.S. at 203 n.20 ("Because Pinholster has failed to demonstrate that the adjudication of his claim based on the state-court record resulted in a decision 'contrary to' or 'involv[ing] an unreasonable application' of federal law, a writ of habeas corpus 'shall not be granted' and our analysis is at an end." (alteration in original)). Accordingly, the district court did

---

[32] He did not seek an evidentiary hearing on Claim 26, which raised the argument that it would violate the Eighth Amendment to execute him after a long delay.

not err in denying Andrews's motion for an evidentiary hearing.

In light of the foregoing, we REVERSE the district court's grant of relief, DISMISS the Eighth Amendment lethal injection claim as unripe, and DENY the petition for a COA of the uncertified claims.

**REVERSED in part, DISMISSED in part, and PETITION DENIED in part.**

---

MURGUIA, Circuit Judge, dissenting in part:

I respectfully dissent. I would affirm the district court's order granting Andrews relief due to ineffective assistance of counsel at the penalty phase of his trial.

Andrews was convicted of three heinous and appalling murders. His prior crimes were violent and antisocial. But due to defense counsel's constitutionally inadequate penalty phase investigation, the jurors who sentenced Andrews to death never knew that he was subjected for two years as a young teenager to brutal, inhumane, and degrading abuse *by his state custodians* at Mt. Meigs, a segregated reform school for "Negro children" in Alabama. Had counsel presented this readily available mitigating evidence, there is a reasonable probability that at least one juror would have been moved to exercise mercy and spare Andrews's life. Yet the California Supreme Court denied relief in a 5-to-2 decision, concluding that counsel's performance was neither deficient nor prejudicial. *See In re Andrews*, 52 P.3d 656 (Cal. 2002).

Fundamentally, it is unconscionable to sentence a man to death absent consideration of mitigating evidence of this magnitude, particularly where counsel failed to present *any* meaningful mitigation evidence. Our "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland v. Washington*, 466 U.S. 668, 696 (1984). Under the standard of review mandated by the Antiterrorism and Effective Death Penalty Act (AEDPA), the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The California Supreme Court's determination that counsel's performance was neither deficient nor prejudicial is not just wrong, it is unreasonable under the clearly established law of *Strickland* and its progeny. Thus, even under the deferential standard of the AEDPA, conditional sentencing relief is warranted.

I

Andrews was sent to the Alabama Industrial School for Negro Children, later known as Mt. Meigs, in the mid-1960s, after stealing a car. He had no prior history of violent crime. He entered the school when he was 14. He left when he was 16.

The California judge who conducted the state court evidentiary hearing described Mt. Meigs as a "segregated brutal institution near Montgomery, Alabama." The state court hearing judge found that the conditions at Mt. Meigs were horrific, and that Andrews was personally subjected to "beatings, brutality, inadequate conditions and sexual predators." Due to "his small stature and passive nature," Andrews was "the target for older boys' depredations." The

California Supreme Court itself acknowledged that Andrews personally endured "appalling" conditions at Mt. Meigs. *See Andrews*, 52 P.3d. at 660.

At the state court evidentiary hearing ordered by the California Supreme Court, several outside observers corroborated the accounts of abuse at Mt. Meigs. A United States federal judge testified that Mt. Meigs, during the time Andrews was there, was a "penal colony" that represented the "absolute denial of basic and fundamental human rights to [African-American] children." A former state probation officer described Mt. Meigs as a "slave camp" for children, run by "illiterate overseers" who forced children to work in the fields harvesting vegetables and picking cotton. The children were "beaten all the time," sometimes with broomsticks, mop handles, and fan belts, and often severely for minor infractions. Violence was pervasive and sexual assaults were common. The state probation officer testified that children committed to Mt. Meigs in the 1960s had no chance of rehabilitation and "came out much worse" than when they entered. The probation officer, who testified before Congress and state legislatures about juvenile justice facilities around the country, stated that Mt. Meigs was "by far, by far . . . the worst facility" that he had seen.

Despite being termed a "school," Mt. Meigs provided little to no education, counseling, or vocational programs to the children in its custody. *See Andrews*, 52 P.3d at 677 (Kennard, J., dissenting). And in 1971, an Alabama district court ordered extensive reforms at the institution after finding that "corporal punishment was promiscuously employed by the school's personnel" and agreeing that "[w]hen officials of a training school have condoned or permitted the frequent and indiscriminate use of corporal punishment . . . they have

demonstrated the callous indifference to children's safety which provides the basis for Eighth Amendment liability" as cruel and unusual punishment. Order, *Stockton v. Alabama Industrial School for Negro Children*, No. 2834-N (N.D. Ala. July 23, 1971) (adopting proposed findings of fact and conclusions of law); *see also Crum v. State Training Sch. for Girls*, 413 F.2d 1348, 1349 (5th Cir. 1969) (ordering the desegregation of Mt. Meigs after finding that it was "inferior in every way" to similar schools for white children).

Andrews was not spared. The state court record chronicles in excruciatingly vivid detail the abuse he personally suffered. When Andrews failed to pick enough cotton, left the grass too high in the fields, or made a mistake in the dining hall, he was whipped with a fan belt or beaten with a stick. The record indicates that Andrews was beaten so severely the skin on his thighs would "bust open." On other occasions Andrews and other wards at Mt. Meigs were forced to pull down their pants, lie on the ground on their stomachs, and place their penises in holes in the earth while they were whipped. The judge who conducted the state court evidentiary hearing found the evidence of abuse "compelling."

The jury that sentenced Andrews to death heard none of this evidence. Yet the California Supreme Court concluded that counsel was not ineffective and, even if ineffective, there was no reasonable probability of a different result at sentencing had the jury heard the Mt. Meigs evidence.

That decision is fundamentally and objectively unreasonable. Consideration of a defendant's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death." *See Eddings v. Oklahoma*,

455 U.S. 104, 112 (1982) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion)). Yet Andrews's counsel presented almost no mitigating evidence at sentencing. The Mt. Meigs evidence is not cumulative to any other evidence presented during the trial or penalty phase. The evidence was readily available. Its sympathetic nature is patently obvious. And without consideration of the degrading abuse that Andrews endured, the jury that sentenced Andrews to death could not fairly "gauge his moral culpability." *See Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam). Confidence in the sentencing outcome has been undermined. *See Strickland*, 466 U.S. at 694.

I recognize that our deference to state court decisions is at its zenith on federal habeas review. *See generally Richter*, 562 U.S. at 104. Under the AEDPA, federal courts are barred from granting habeas relief as to state court convictions if jurists of reason could debate the correctness of the state court's decision. *See id.* at 101. "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Federal habeas relief is warranted, however, if "the state court identifies the correct governing legal principle" from the decisions of the Supreme Court but *unreasonably* applies that principle to the facts of the petitioner's case. *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see* 28 U.S.C. § 2254(d)(1). This case meets that stringent standard for collateral relief on federal habeas review.

## II

Regarding *Strickland*'s first prong, the California Supreme Court unreasonably applied clearly established federal law in

concluding that counsel's performance at the penalty phase was adequate.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. When counsel have not fulfilled "their obligation to conduct a thorough investigation of the defendant's background," their failure to identify and set forth substantial mitigating evidence at sentencing cannot be justified as a "tactical decision." *See Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4–4.1, commentary, p. 4–55 (2d ed. 1980)); *see also Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003).

Andrews's trial counsel conducted "virtually no penalty phase investigation" and "did not call a single witness at the penalty phase." *Andrews*, 52 P.3d at 676 (Kennard, J., dissenting). Nor did counsel ask their investigators to do any work on the penalty phase. Indeed, Andrews's counsel made no serious effort to discover mitigating evidence.[1]

---

[1] The majority cites trips that Andrews's counsel made to Alabama and Florida as evidence that they conducted something other than a cursory penalty phase investigation. Majority at 25 n.3. Yet by the lawyers' own account, their penalty phase investigation consisted of just three activities. First, the lawyers spent a day in the Mobile courthouse pulling records of Andrews's prior convictions. One of the lawyers initially testified that their trip to Alabama included three days of investigation. He changed that account after being confronted with evidence that they were in New Orleans for most of the time, flying to Mobile on a Saturday and returning to New Orleans on the same day. New Orleans had no relation to the case; the dates of the trip "coincided" with Mardi Gras celebrations. Second, only after Andrews's first trial ended in a hung jury, the lawyers interviewed Andrews's mother during a layover in the Pensacola airport, after they briefly revisited the Mobile courthouse to examine records of

The state court judge who presided over the evidentiary hearing expressly found that defense counsel could have uncovered the Mt. Meigs evidence with "simple persistence" and standard investigative techniques. *See Andrews*, 52 P.3d at 680 (Kennard, J., dissenting); *see also id.* at 681 (noting that routine legal research of public records would have revealed lawsuits involving these Alabama institutions). The California Supreme Court does not dispute that finding. *See Andrews*, 52 P.3d at 668.

A

The California Supreme Court, however, excused counsel's failure to discover the Mt. Meigs evidence for a number of unsupported and unsupportable reasons, concluding that counsel's investigation was constitutionally adequate because: (1) Andrews did not want his family involved; (2) Andrews did not tell counsel about the appalling conditions he endured while confined at Mt. Meigs; (3) the Mt. Meigs evidence could have backfired, for the evidence

---

Andrews's prior convictions. The interview did not go into detail about Andrews's background, and the lawyers did not inquire about the names or contact information of relatives or anybody else who knew Andrews and could speak to his history. Third, the lawyers asserted that they spent some time in Mobile during one of their two trips unsuccessfully "look[ing] for evidence of Jesse's character and good deeds." The lawyers, however, did not interview a single person, contact any of Andrews's family or friends, or look into Andrews's institutional history. Similarly, the two defense investigators testified that their efforts were limited to the guilt phase, and that neither of Andrews's attorneys asked them to do *any* investigation into Andrews's background for a possible penalty phase. The California Supreme Court's referee characterized counsel's "actual efforts" to gather mitigating evidence for the penalty phase as "limited," a characterization which in light of this record is understated, if not overly generous.

would have come primarily from prisoners; (4) counsel's limited investigation was reasonable because counsel had a reasonable strategy at the penalty phase; and (5) the Mt. Meigs evidence could have opened the door to more evidence regarding Andrews's prior acts of violence. Not one of these rationales withstands scrutiny or excuses counsel's failure to perform a basic investigation into his client's life history.

### (1)  Andrews's Refusal to Involve his Family.

The California Supreme Court found counsel's limited investigation adequate partly because Andrews refused to involve his family at the penalty phase. *See Andrews*, 52 P.3d at 668. The California Supreme Court reasoned as follows: "Although the referee found that counsel could have discovered the mitigating evidence presented at the reference hearing with 'simple persistence,' it is equally clear petitioner insisted they not involve his family. 'As we have repeatedly explained, an attorney representing a defendant at the penalty phase of a capital case is not required to present potentially mitigating evidence over the defendant's objections. . . .'" *Id.* (quoting *People v. Kirkpatrick*, 874 P.2d 248 (Cal. 1994)).

The California Supreme Court is correct that Andrews did not want his family involved. And it is also correct that the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *See Strickland*, 466 U.S. at 691. However, excusing counsel's failure to present the Mt. Meigs evidence based upon Andrews's refusal to involve his family is unreasonable on its face for a simple reason: presenting the Mt. Meigs evidence would *not* have required any involvement by Andrews's family. Instead, as accounted herein, defense counsel could have introduced the Mt. Meigs

evidence by admitting public records and by presenting the testimony of numerous experts and respected observers.

The state court's rationale is also unreasonable in light of the record before it. Andrews's trial attorney testified at the state court evidentiary hearing that Andrews imposed no limitations on a penalty phase investigation into his background, apart from not wanting to have his family testify. The state court hearing judge found no obstacle to calling witnesses who were not members of Andrews's family.

It was therefore unreasonable for the California Supreme Court to excuse counsel's failure to present the Mt. Meigs evidence based upon Andrews's refusal to involve his family. *See* 28 U.S.C. § 2254(d)(2) (stating that federal habeas relief is warranted if the state court decision was based upon an unreasonable determination of facts in light of the evidence presented in the state court proceeding); *cf. Porter*, 558 U.S. at 40 (stating that counsel's decision not to investigate must reflect a "reasonable professional judgment," even when the client is "fatalistic or uncooperative").

### (2) Andrews's Failure to Tell Counsel About His Time at Mt. Meigs

The California Supreme Court also faulted Andrews for not telling trial counsel about the appalling conditions he endured while at Mt. Meigs. *See Andrews*, 52 P.3d at 668 ("While counsel were aware petitioner had been incarcerated in the Alabama prison system, he did not inform them of the conditions he endured thereby alerting them to the need for further investigation of possible mitigation."). However, no evidence in the record suggests that counsel ever asked Andrews any questions that would have elicited that history.

*See Andrews*, 52 P.3d at 681 (Kennard, J., dissenting) (stating Andrews "did not withhold that information. His attorneys never raised the subject.").[2] Nor is there any evidence that Andrews, "described by one of his trial attorneys as 'very cooperative,' would have refused to discuss his reform school and prison experiences in Alabama had he been asked about them." *Id.*

Given those facts, the California Supreme Court was unreasonable in placing the burden on Andrews to comprehend and offer mitigation theories at the penalty phase of his own trial. Under clearly established Supreme Court law, legal strategy is the duty and domain of learned counsel; while a defendant "has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal," legal strategy decisions are matters of professional judgment that fall within counsel's domain and are the responsibility of counsel. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). And, as accounted above, the most basic of investigations into Andrews's life history would have uncovered the evidence of the abuse he suffered. *Cf.*

---

[2] The majority generally and repeatedly accuses the dissent of engaging in a de novo review when evaluating whether the California Supreme Court's determinations were reasonable. Yet deference does not eviscerate our duty to examine and evaluate the record to determine the reasonableness of the state court's conclusions. Further, in engaging in that inquiry, it is entirely proper to look to a state court dissenting opinion that may shed light on whether the state court majority's determinations were reasonable or unreasonable in light of the record as a whole. Facts on federal habeas review are not limited to only the facts stated in the state supreme court's majority opinion. *Cf.* 28 U.S.C. § 2254(d)(2) (stating that federal habeas relief is warranted if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented").

*Williams*, 529 U.S. at 395 (finding counsel deficient for failing to review defendant's juvenile records that "would have uncovered extensive records graphically describing [defendant's] nightmarish childhood").

### (3) The Reliance on Prisoners to Present the Mt. Meigs Evidence

The California Supreme Court further concluded it was reasonable for counsel not to present the Mt. Meigs evidence because such evidence could have backfired as it "would come primarily from the testimony of petitioner's fellow prisoners, many of whom were hardened criminals with serious felony records." *See Andrews*, 52 P.3d at 668–69.[3]

However, the Mt. Meigs evidence was not dependent upon testimony from prisoners. At Andrews's state court evidentiary hearing, "a federal district judge, a priest, a college dean, a clinical psychologist, a longtime prison doctor, and the regional director of the Federal Bureau of Detention, all . . . gave powerfully effective testimony about the shocking conditions at" Mt. Meigs. *Andrews*, 52 P.3d at 681 (Kennard, J., dissenting); *e.g.*, *id.* at 677 (discussing

---

[3] The California Supreme Court's opinion often conflates the evidence of abuse that Andrews suffered as a youth at Mt. Meigs with other potential mitigating evidence he could have introduced regarding the abuse he sustained as an adult in the Alabama prison system. Because counsel's failure to investigate and introduce the Mt. Meigs evidence, standing alone, plainly rendered counsel's performance deficient, I only address the Mt. Meigs evidence. However, the dissent in the California Supreme Court provides an accurate and thorough accounting of the additional mitigating evidence that counsel could have introduced. *See Andrews*, 52 P.3d at 676–80 (Kennard, J., dissenting) (describing Andrews's time in Alabama prisons that were later found to violate the Eighth Amendment's prohibition against cruel and unusual punishment).

testimony of federal district court judge Ira Dement, who referred to Mt. Meigs as a "penal colony for children").

In light of the state court record, it therefore was unreasonable for the California Supreme Court to excuse counsel's failure to present the Mt. Meigs evidence on the basis that such evidence would have primarily depended upon the testimony of prisoners. *See* 28 U.S.C. § 2254(d)(2); *see also Wiggins*, 539 U.S. at 528 (stating that "partial reliance on an erroneous factual finding" can show "the unreasonableness of the state court's decision.").

### (4) Counsel's Penalty Strategy

The California Supreme Court expressly acknowledged that the record at the state court evidentiary hearing suggested that counsel could have conducted a more thorough investigation into Andrews's background. *See Andrews*, 52 P.3d at 669. However, the California Supreme Court ultimately concluded that counsel's penalty phase performance was adequate because counsel had decided upon a reasonable strategy, one that apparently did not involve or require any meaningful preliminary investigation into Andrews's social history. According to the California Supreme Court, counsel presented a "reasonable case for sparing petitioner's life" by (1) portraying Andrews "as a follower rather than as violently antisocial"; and (2) arguing a death sentence was not warranted because "others who had committed more heinous multiple murders" were not sentenced to death and Andrews's co-defendant Sanders had received a lighter sentence. *See id.*

The California Supreme Court's decision is unreasonable because neither strategy was supported by the evidence

presented at trial.  Further, the state court's decision is unreasonable because it ignores counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

The evidence as to the crimes of conviction which rendered Andrews death eligible belied the depiction of Andrews as a follower, rendering counsel's penalty phase pitch to the jury contrary to the record, hollow, and false.  *See Andrews*, 52 P.3d at 682 (Kennard, J., dissenting) ("[T]hat was a disastrous strategy, one no reasonably competent attorney would have used").  Indeed, "the only evidence before the jury was that petitioner was the instigator rather than a follower."  *Id*.  The "evidence showed that [Andrews] was the leader and the perpetrator of the crimes while Sanders was the follower; thus, jurors were not likely to be troubled by Sanders's lighter sentence."  *Id*.

Given the evidence at trial, no reasonable argument can be made that counsel's strategy to depict Andrews as a follower was reasonable, particularly when it was unsupported by a basic investigation into Andrews's background to determine what other mitigating evidence was available.  *See Bobby v. Van Hook*, 130 S.Ct. 13, 17 (2009) (stating that counsel must make "objectively reasonable choices") (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)); *see Wiggins*, 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.").

The California Supreme Court cited *Burger v. Kemp*, 483 U.S. 776 (1987), as supporting the proposition that it is reasonable to forego mitigating evidence when it would open

the door to rebuttal evidence which would contradict counsel's strategy of portraying defendant as the follower. *See Andrews*, 52 P.3d at 673 (citing *Burger*, 483 U.S. at 793). The California Supreme Court's reliance on *Burger* is unreasonable for two reasons. First, in *Burger*, defense counsel performed a robust initial mitigation investigation and spoke to a family member, a friend, and a psychologist to learn about his client's background. *See Burger*, 483 U.S. at 790–91. Based upon what Burger's counsel learned, counsel decided against pursuing a mitigation case relying on that background, *id.* at 791, even though it turned out that further investigation would have produced additional evidence that defendant had "an exceptionally unhappy and unstable childhood." *Id.* at 789. As the Supreme Court concluded, counsel's initial investigation led him to make the "reasonable decision that his client's interest would not be served by presenting this type of [mitigating] evidence." *Id.* at 791. The facts of this case are very different. Unlike Burger's defense counsel, Andrews's attorneys never performed any meaningful initial investigation into their client's background. Absent such an investigation, the lawyers cannot be said to have made informed strategic choices about how to proceed in a possible penalty phase of trial.

Second and relatedly, in *Burger*, counsel's depiction of his client as a follower was a reasonable strategy *for it was supported by the record*. *See Burger*, 483 U.S. at 779 (noting primary evidence at trial showed that Burger's co-defendant Stevens "was primarily responsible for the plan to kidnap the [victim], the physical abuse of the victim, and the decision to kill him"). In contrast, the evidence at Andrews's trial plainly showed that Andrews was not a follower, but the main criminal actor. Thus, the California Supreme Court's

statement that "we reach the same conclusion on comparable facts," *see Andrews*, 52 P.3d at 673, is wrong for the facts in *Burger* are not comparable. The California Supreme Court's reliance on *Burger* is unreasonable.

The California Supreme Court also unreasonably applied Supreme Court law when it cited *Bell v. Cone*, 535 U.S. 685 (2002), to support its conclusion that counsel reasonably decided not to present evidence of Andrews's background. *See Andrews*, 52 P.3d at 673 (citing *Cone*, 535 U.S. at 699–700). Before noting that defense counsel saw the neighborhood Andrews grew up in and considered it unimpressive because it was comparable to counsel's own, the California Supreme Court cited *Cone* for the proposition that counsel may reasonably decide not to present background evidence when testimony about a defendant's "normal youth" might, in the eyes of the jury, be perceived negatively and cut the other way. *See id*. However, all reasonable jurists would agree that the years Andrews spent at Mt. Meigs were the *antithesis* of a "normal youth." The California Supreme Court's invocation of *Cone*, while simultaneously ignoring that Andrews's "youth" included his experience at Mt. Meigs, was an objectively unreasonable application of Supreme Court law. *See Wiggins*, 539 U.S. at 526–27 (observing that the "strategic decision" offered "to justify counsel's limited pursuit of mitigating evidence resembles . . . a *post hoc* rationalization of counsel's conduct."); *cf. Porter*, 558 U.S. at 43 (concluding that state supreme court was "unreasonable to discount to irrelevance the evidence of Porter's abusive childhood").

### (5) Opening the Door to Andrews's Prior Acts of Violence.

Finally, the California Supreme Court concluded counsel's failure to present the Mt. Meigs evidence, among other mitigation evidence, was reasonable because such evidence could have opened the door to more evidence regarding Andrews's prior acts of violence. *See Andrews*, 52 P.3d at 669 (stating that by not introducing the evidence, counsel "foreclosed the introduction of substantial aggravating evidence in rebuttal or on cross-examination that could have undermined the defense by depicting petitioner as aggressive and desensitized to violence"). The California Supreme Court's decision on this point is unreasonable for at least two reasons.

One, the prosecutor from Andrews's trial, who in the interim had become a superior court judge, "testified that if the defense had presented evidence of the Alabama prison conditions he probably would *not* have called rebuttal witnesses to give details about petitioner's Alabama crimes." *See Andrews*, 52 P.3d at 682 (Kennard, J., dissenting).[4]

---

[4] It is also possible, if not likely, that a California court would not have admitted evidence of prior offenses to rebut the mitigating evidence of childhood abuse that Andrews suffered at Mt. Meigs. *Cf. In re Lucas*, 94 P.3d 477, 510 (Cal. 2004) (concluding, in a unanimous decision, that mitigating evidence showing "that a defendant suffered abuse in childhood generally does not open the door to evidence of [a] defendant's prior crimes or other misconduct").

Two, even if the prosecutor had rebutted with more evidence regarding Andrews's prior violent crimes,[5] the jury already knew based upon Andrews's heinous crimes of conviction that he was "aggressive and desensitized to violence." The jury also knew, by stipulation, of Andrews's prior convictions for murder in 1967, armed robbery in 1968, escape in 1969, and robbery in 1977 which the prosecution introduced as aggravating factors at the penalty phase.[6] More evidence regarding Andrews's prior convictions would have reinforced what the jury already knew, namely that Andrews committed heinous crimes and clearly was "aggressive and desensitized to violence."

The clearly established law of *Strickland* itself supports the conclusion that the California Supreme Court's decision was unreasonable. In *Strickland*, it was reasonable for counsel not to present mitigating evidence that "would barely have altered the sentencing profile" and could have opened the door to prior convictions which counsel had successfully moved to exclude. 466 U.S. at 699–700. So too in *Darden*

---

[5] The majority accurately observes that the referee and the California Supreme Court majority concluded that if trial counsel had presented the Mt. Meigs evidence, the prosecutor would have introduced rebuttal evidence. Majority at 30–31 n.8. But that finding fails to take into account the plain statement by the former prosecutor—later a state court judge—that he probably would not have responded with rebuttal evidence. The referee and California Supreme Court decided not to take the former prosecutor at his word and instead speculated about what the prosecutor would have done. That decision was unreasonable. *Cf.* 28 U.S.C. § 2254(d)(2).

[6] By stipulation, the jury knew that Andrews's 1967 murder conviction was for felony murder stemming from an incident when Andrews, then 16, and an accomplice robbed a grocery store and the accomplice (not Andrews) shot and killed a store clerk during the robbery.

*v. Wainwright*, where counsel's decision to present an alternate strategy at sentencing was reasonable because evidence regarding defendant's background could have opened the door to his prior convictions that had not previously been admitted in evidence. *See* 477 U.S. 168, 186 (1986).

In contrast, in cases where a defendant's prior criminal history is known to the jury, counsel performs unreasonably in not presenting a range of persuasive mitigating evidence about the defendant's background that "no other source had opened up." *See Rompilla v. Beard*, 545 U.S. 374, 383, 390 (2005) (finding counsel ineffective when counsel knew the prosecution would introduce at the penalty phase defendant's "significant history" of prior violent crimes, but counsel nevertheless failed to review the readily available prior conviction file and present mitigation evidence therefrom); *see also Williams*, 529 U.S. at 368–69, 395 (finding counsel's performance deficient when the jury knew of Williams's extensive violent criminal history, and counsel failed to review juvenile records that would have uncovered graphic mitigating evidence of Williams's "nightmarish childhood"). At a minimum, counsel has a duty to conduct the necessary investigation into his client's background to learn the range of mitigating evidence available. *See Williams*, 529 U.S. at 395–96.

## B

In sum, there was no conceivable tactical reason either to forego the investigation into Andrews's background or to forego the presentation of the compelling Mt. Meigs evidence. Any competent attorney would have concluded that the Mt. Meigs evidence was the *only* evidence in this

case that carried a substantial probability of a different sentence. That evidence is critical precisely because it provides the jury with a reason to extend mercy despite Andrews's heinous crimes. As such, any competent attorney would have presented the evidence, argued that the abuse Andrews suffered as a youth at the hands of his state custodians explains why he is inured to violence, and urged the jurors to spare Andrews's life on that ground.[7]

The California Supreme Court recognized that the United States Supreme Court held in *Williams* that habeas relief was warranted when counsel failed at the penalty phase to present to the jury evidence of petitioner's "nightmarish childhood," model behavior while imprisoned, and borderline retardation. *See Andrews*, 52 P.3d at 674. The California Supreme Court, however, distinguished *Williams* because, in that case, counsel's investigation was "essentially nonexistent due to an incorrect understanding of the law." *See id.* (citing *Williams*, 529 U.S. at 395–96). The California Supreme Court is correct that in *Williams*, counsel's failure to investigate was based at least in part upon his incorrect understanding of the law. But surely no reasonable jurist would read *Williams* as holding that a virtually nonexistent penalty phase investigation is reasonable so long as it is not based upon a misunderstanding of the law. Indeed, the United States

---

[7] The California Supreme Court suggested there was "no compelling connection" between the un-presented mitigating evidence and the crimes Andrews committed. *Andrews*, 52 P.3d at 672 (quoting *In re Ross*, 892 P.2d 1287, 1305 (Cal. 1995)). To the extent the California Supreme Court suggested a causal nexus is required between mitigating evidence and defendant's crimes, the California Supreme Court's decision was contrary to Supreme Court law. *See Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (noting "well-established" principle that any relevant mitigating evidence may be considered).

Supreme Court does not read *Williams* so narrowly. In *Wiggins*, the Supreme Court underscored that in *Williams* it held the "failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'" *See Wiggins*, 539 U.S. at 522 (quoting *Williams*, 529 U.S. at 396).

The duty to conduct a thorough investigation of a capital defendant's background is imposed on counsel to prevent this very circumstance: a man sentenced to death without consideration of non-cumulative, readily available personal history evidence of compelling mitigating value. The California Supreme Court unreasonably applied clearly established federal law when it concluded that defense counsel's performance was constitutionally adequate in this case.

## III

Under *Strickland*'s second prong, the California Supreme Court majority concluded that even if Andrews's counsel performed inadequately, Andrews suffered no prejudice from the omission of the Mt. Meigs evidence at sentencing. That conclusion too is based upon an objectively unreasonable application of *Strickland* and its progeny.

Under *Strickland*, a capital defendant suffers prejudice from counsel's deficient performance when "there is a reasonable probability that, absent the errors [of counsel], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. As *Strickland* clarified,

"[a] reasonable probability is a probability sufficient to undermine confidence in the outcome," not a probability that the result "more likely than not" would have been different. *Id*. at 693–94.  For a state court considering a habeas petition asserting ineffective assistance of counsel, the inquiry is straightforward:  counsel's deficient performance prejudiced the petitioner if he can show "a reasonable probability that at least one juror" would have recommended a sentence of life instead of death.  *Wiggins*, 539 U.S. at 537.  For a federal court reviewing a habeas petition filed after the AEDPA's passage, the determinative question is whether the state court's finding that petitioner was not prejudiced was not just error, but "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

In this case, the California Supreme Court concluded there was no reasonable probability of a life sentence even if counsel had presented the mitigating evidence regarding Andrews's background.  Unlike the majority, I would hold that such a conclusion constitutes an unreasonable application of federal law that was clearly established at the time of the state court's decision.

A

Consideration of the defendant's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death."  *Eddings*, 455 U.S. at 112. The abuse that Andrews suffered at Mt. Meigs epitomizes the "kind of troubled history" that the Supreme Court repeatedly has "declared relevant to assessing a defendant's moral

culpability." *Wiggins*, 539 U.S. at 535; *see also id.* at 535–36 (holding a different sentencing outcome was reasonably probable had defense counsel presented evidence that Wiggins suffered early privation and abuse, as well as physical torment, sexual molestation, and repeated rape in foster care). Such evidence is "relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse*." *Boyde v. California*, 494 U.S. 370, 382 (1990) (internal quotations marks omitted).

Without consideration of the compelling and readily available Mt. Meigs evidence, Andrews's moral culpability could not be fairly gauged at sentencing. *See Porter*, 558 U.S. at 41. Indeed, the "benchmark" for assessing an ineffective assistance claim is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Here, counsel's failure to present the evidence of severe abuse that Andrews suffered, combined with counsel's failure to present any substantial mitigation case at sentencing, deprived Andrews of a fair sentencing proceeding and renders his death sentence "unreliable." *See id.* at 700. At bottom, it was unreasonable for the California Supreme Court to conclude that if the jury had heard the Mt. Meigs evidence, there is no reasonable probability that even one juror would have recommended a sentence of life instead of death.

The majority disagrees and observes that the Supreme Court "has found a reasonable probability of a different outcome when scant and weak aggravating evidence could

have been presented in rebuttal to strongly mitigating evidence." Majority at 47–47 (citing *Wiggins*, 539 U.S. at 534–36, 537–38). Yet the Supreme Court has also found a reasonable probability of a different outcome when aggravating evidence is substantial and mitigating evidence is compelling. *See Williams*, 529 U.S. at 398; *Porter*, 558 U.S. at 40–44. Indeed, at the time of the California Supreme Court's decision in this case, no decision by the United States Supreme Court had excused a failure to present a compelling mitigation case where one was available.

As the majority recognizes, *Williams* and *Porter* are particularly instructive. In *Williams*, the Supreme Court held there was a reasonable probability of a different result at sentencing if counsel had presented evidence either of defendant's "nightmarish childhood" or his diminished intellectual ability. *See Williams*, 529 U.S. at 398. Notably, unlike in this case, Williams's counsel actually presented mitigating evidence, including testimony from two neighbors and Williams's mother, and "a taped excerpt of a statement by a psychiatrist." *See id*. at 369. Contrary to the majority's description of the case, the aggravating factors in *Williams* were severe. Two prosecution expert witnesses testified at sentencing "that there was a 'high probability' that Williams would pose a serious continuing threat to society." *See id*. at 368–69. And the jury heard evidence that in the months after the murder for which Williams was sentenced to death, "Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw." *Id*. at 418 (Rehnquist, C.J., concurring in part and dissenting in part) (quoting *Williams v. Taylor*, 163 F.3d 860, 868 (4th Cir. 1998), *rev'd*, 529 U.S. 362 (2000)); *see id.* at 368 (providing

the majority's description of the aggravating evidence, including that Williams: had committed "two separate violent assaults on elderly victims," specifically setting a fire outside one elderly victim's house before attacking and robbing him, and leaving the other elderly victim, a woman, in a "vegetative state"; was convicted of arson for the fire he set in the jail while awaiting trial; and had prior convictions for armed robbery, burglary, and grand larceny).

Despite these strong aggravating factors, the Supreme Court held that Williams was prejudiced by his counsel's failure to introduce the undiscovered mitigation evidence. Importantly for this case, the Court stated that the evidence regarding Williams's "nightmarish childhood" would have been enough, standing alone, to sustain a finding of prejudice. As the Court expressly held, "the graphic description of Williams' childhood, filled with abuse and privation, *or* the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *See id.* at 398 (emphasis added).

*Williams* plainly supports the conclusion that the California Supreme Court unreasonably applied clearly established federal law in concluding that Andrews was not prejudiced by his counsel's failure to introduce evidence of the extreme brutality that Andrews suffered as a youth. The total evidence in aggravation, that which was admitted and that which may have come in as rebuttal evidence concerning Andrews's prior violent crimes (which the prosecutor testified at the state court hearing he probably would *not* have introduced), was certainly no greater than the aggravating evidence in *Williams*. Similar to *Williams*, the overlooked mitigating evidence in Andrews's case includes severe and sustained physical, sexual, and psychological abuse.

Andrews's overlooked mitigating evidence is made even stronger by the fact that the abuse at issue was inflicted in large part at the hands of his state custodians and was broadly corroborated by respected authorities, as previously accounted.[8]

The Supreme Court's decision in *Porter* also demonstrates the unreasonableness of the California Supreme Court's conclusion that Andrews was not prejudiced. Although the Supreme Court decided *Porter* after the California Supreme Court denied Andrews's ineffective assistance claim, *Porter* is still relevant to assessing prejudice under 28 U.S.C. § 2254(d).[9]  *See Wiggins*, 539 U.S. at 522

---

[8] The Supreme Court later stated that *Williams* offers "no guidance with respect to whether a state court has unreasonably determined that prejudice is lacking" because AEDPA deference was not applied to the *Strickland* prejudice question in *Williams*.  *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1410–11 (2011) (citing *Williams*, 529 U.S. at 395–97); *but see Williams*, 529 U.S. at 415–16 (O'Connor, J., concurring) ("I also agree with the Court that, to the extent the Virginia Supreme Court did apply *Strickland*, its application was unreasonable").  In any event, *Williams* was decided two years before the California Supreme Court denied Andrews's habeas petition.  Thus, at the time the California Supreme Court decided Andrews's ineffective assistance claim, *Williams* was highly relevant for determining what omitted mitigating evidence is prejudicial under *Strickland*.  *See Williams*, 529 U.S. at 398 ("[T]he graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."); *see also id.* at 415 (O'Connor, J., concurring) (concluding that Williams was prejudiced by counsel's failure to present substantial mitigating evidence, including evidence of his "nightmarish childhood," and that the Virginia Supreme Court was unreasonable in concluding otherwise).

[9] The majority acknowledges that *Porter* is relevant to determining whether the California Supreme Court unreasonably applied *Strickland*. Majority at 59 ("Although *Porter* was decided years after the California

(approving reliance on Supreme Court opinions issued after the state court's decision, when the merits of the claim were governed by the holdings of *Strickland*).

In *Porter*, due to counsel's failure to adequately investigate Porter's background, the jury that sentenced him to death never knew that he had been abused as a child and was a decorated Korean War veteran suffering from post-traumatic stress. *See Porter*, 558 U.S. at 40–44. The Supreme Court held that the Florida Supreme Court was unreasonable in concluding that Porter had not been prejudiced at sentencing by the omission of this key personal history evidence. The Supreme Court concluded that without that evidence, the sentencer was unable to "accurately gauge" the defendant's "moral culpability" and habeas relief was warranted because confidence in the sentencing outcome had been undermined. *See id*. at 41; *see also Rompilla*, 545 U.S. at 393 (stating that the relevant test is *not* whether the jury, had it heard the omitted mitigating evidence, could still have returned a verdict of death).[10]

---

Supreme Court's opinion in this case, we give its prejudice analysis careful consideration, because *Porter* considered prejudice under AEDPA, and therefore provides direction for determining what constitutes an unreasonable application of the prejudice prong of *Strickland* under AEDPA.").

[10] The majority criticizes my reference to *Rompilla*, insisting *Rompilla* "do[es] not provide any guidance on the issue before us, whether a state court's determination that counsel's deficiency was not prejudicial was an unreasonable application of clearly established Supreme Court precedent." Majority at 65 n.24. But I cite *Rompilla* for the well-established principle that the *Strickland* test for prejudice does not turn on whether the jury still could have returned a death sentence even if it had heard the mitigating evidence. *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional

As in *Williams*, the Supreme Court in *Porter* affirmed that a strong case in aggravation does not preclude the conclusion that a state court was unreasonable in denying habeas relief. *Porter* stood convicted of two murders and faced considerable evidence of premeditation, but the Supreme Court nonetheless held it was objectively unreasonable for the Florida Supreme Court to conclude that Porter had not been prejudiced at sentencing by the omission of the mitigating evidence. *Porter*, 558 U.S. at 31. The same conclusion applies in Andrews's case. Despite strong aggravating evidence, there is a reasonable probability of a different result at sentencing if the jury had heard the powerful evidence of the abuse Andrews suffered as a youth. It is unreasonable to conclude otherwise.

The majority disagrees. Relying on the Supreme Court's opinion in *Woodford v. Visciotti*, 537 U.S. 19 (2002), decided *after* the California Supreme Court's decision in this case, the majority insists it was not unreasonable to hold that Andrews suffered no prejudice. Majority at 63–64. The majority is mistaken. The balance of mitigating and aggravating factors in *Visciotti* was dramatically different from the balance in *Andrews*. In *Visciotti*, the potential mitigating evidence at issue was expert testimony addressing the psychological abuse that Visciotti suffered due to being raised in a dysfunctional family. *See Visciotti*, 537 U.S. at 26. *Visciotti* involved no allegations of physical or sexual abuse, and the psychological abuse failed to approach what Andrews experienced at Mt. Meigs. The aggravating evidence in

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."). The test is not whether counsel's inadequate performance "more likely than not altered the outcome in the case." *See id.* at 693.

*Visciotti* included a prior offense in which Visciotti stabbed "a pregnant woman as she lay in bed trying to protect her unborn baby." *See id.* Given the strong evidence in aggravation and the relatively weak mitigating evidence, the Supreme Court concluded it was not unreasonable for the California Supreme Court to conclude that Visciotti was not prejudiced by counsel's failure to introduce the dysfunctional family evidence. *Id.* at 26–27. In contrast, the facts of Andrews's case present a very different balance of factors and compel a different result. The majority's contention that the Mt. Meigs evidence at most carries only the "mere possibility of a different outcome," Majority at 66, grossly underestimates the mitigating force of that evidence. The Mt. Meigs mitigating evidence in *Andrews* is extraordinarily strong. The majority's reliance on *Visciotti* is unfounded.

B

The California Supreme Court also reasoned that Andrews was not prejudiced because the Mt. Meigs evidence, in addition to evidence of abuse Andrews suffered as an adult in the Alabama prison system, is "not conclusively and unambiguously mitigating" but "could equally have proved a double-edged sword." *See Andrews*, 52 P.3d at 670–71. According to the California Supreme Court, "[r]ather than engendering sympathy" such evidence "could well have reinforced an impression of him as a person who had become desensitized and inured to violence and disrespect for the law" or could have confirmed Andrews had "an antisocial personality." *See id.* at 671. That conclusion is unreasonable.

The jury already knew from Andrews's heinous crimes of conviction and from the stipulated prior convictions that Andrews was antisocial and "had become desensitized and

inured to violence and disrespect for the law." No person considering Andrews's crimes of conviction would conclude otherwise. But the jurors knew absolutely nothing about Andrews's past that might explain the person he had become and provide a basis for the exercise of mercy.

The severe and sustained abuse that Andrews suffered at Mt. Meigs provides such evidence. The California Supreme Court agreed the evidence presented at the state court hearing "leaves no doubt" Andrews "endured horrifically demeaning and degrading circumstances." *See Andrews*, 52 P.3d at 670. Yet the jury that sentenced Andrews to death knew nothing about those circumstances. Had the jury heard that for two years as a teenager Andrews was subjected to brutal, inhumane, and degrading abuse *by his state custodians* at a segregated reform school for African-American children in Alabama in the 1960s, there is a reasonable probability that at least one juror would have been swayed to exercise mercy and spare Andrews's life. There is "too much mitigating evidence that was not presented to now be ignored." *Porter*, 558 U.S. at 44 (internal quotation marks omitted). No reasonable person would conclude otherwise.

The prejudice to Andrews caused by the omission of the Mt. Meigs evidence at sentencing is compounded by the fact that counsel presented no sympathetic mitigating evidence at Andrews's sentencing. Indeed, at the penalty phase of Andrews's trial, counsel called no witnesses and offered no statements from psychologists, family, or friends. In short, defense counsel presented almost nothing to counter the prosecution's portrayal of their client. The clearly established law of *Strickland* recognizes that some errors by counsel will have "pervasive effect . . . altering the entire evidentiary

picture." *See Strickland*, 466 U.S. at 695–96. *Andrews* is such a case.

It is unconscionable that Andrews should be sentenced to death without consideration of the egregious abuse that he suffered at Mt. Meigs. Had counsel presented the Mt. Meigs evidence at sentencing, it is reasonably probable that at least one juror would have been moved to exercise mercy and spare Andrews's life. It is objectively unreasonable, and a legal fiction, to conclude otherwise.

IV

The district court's conditional grant of sentencing relief should be affirmed. I respectfully dissent.